RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0306p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOSE SIERRA-VILLEGAS,

*Defendant-Appellant.*

No. 13-2513

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:12-cr-00208-1—Robert J. Jonker, District Judge.

Argued: September 30, 2014

Decided and Filed: December 23, 2014

Before: DAUGHTREY, ROGERS, and DONALD, Circuit Judges.

─────────────

**COUNSEL**

**ARGUED:** C. Ryan Grondzik, WARNER, NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellant. John C. Bruha, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** C. Ryan Grondzik, Brian P. Lennon, WARNER, NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellant. John C. Bruha, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

─────────────

**OPINION**

─────────────

ROGERS, Circuit Judge. Jose Sierra-Villegas appeals his conviction and 325-month sentence for possession with intent to distribute methamphetamine and conspiracy. Sierra-Villegas was arrested shortly after the failure of a massive drug sale to an undercover officer that

1

had been coordinated in part by a confidential informant. Sierra-Villegas allegedly played a leadership role in the attempted sale, coordinating the delivery of methamphetamine to his coconspirators and personally travelling from Kansas City, Missouri to Michigan to ensure the transaction would go forward. All of Sierra-Villegas's alleged coconspirators agreed to plea bargains, and three testified against Sierra-Villegas at trial. The prosecution's evidence allowed Sierra-Villegas to deduce the identity of the confidential informant, but the district court, citing the informant privilege, denied Sierra-Villegas's motion to compel the government to disclose the informant's name on the record and allow the informant to testify. Sierra-Villegas challenges his conviction on the grounds that this denied him the opportunity to present his defense effectively. Additionally, Sierra-Villegas challenges the evidentiary basis for applying sentencing enhancements for leadership, firearms possession, and obstruction of justice, and challenges his 325-month sentence as unreasonable. Because all of Sierra-Villegas's claims are without merit, his conviction and sentence must be upheld.

I.

In June 2012, a confidential informant (hereafter "the CI") contacted the Department of Homeland Security regarding a group of suspects selling large quantities of crystal methamphetamine in Michigan. The CI identified Alejandro Garcia as the person selling locally, and identified Sierra-Villegas as also being involved. The CI arranged a meeting between an undercover officer posing as a meth dealer and Garcia, at which the undercover officer offered to purchase 20 pounds of crystal methamphetamine, which Garcia promised to provide. On July 2, 2012 Sierra-Villegas sent a text message to Garcia containing directions to a truck stop near Fremont, Indiana. Garcia and Thomas Streich, his associate and coconspirator, drove there and met a truck driver who gave Streich 20 pounds of crystal methamphetamine. Streich stored the meth in a barn on his property in Van Buren County, Michigan. On July 12, after completing a smaller meth transaction with the officer but before selling the 20 pounds, Garcia became suspicious that he was under police surveillance, changed his phone, and, via the CI, asked the undercover officer to hold off on the transaction. Garcia continued to dither through August 2. The next day the undercover officer asked the CI to put pressure on Garcia to complete the transaction. On August 7 the CI informed the undercover officer that Sierra-Villegas would

shortly travel to Michigan from Kansas City to facilitate the deal. The undercover officer arranged for the CI to make a recorded call to Sierra-Villegas to discuss the trip and the transaction; the call took place on August 9, and Sierra-Villegas appeared to confirm that he would ensure that the deal would happen.

Sierra-Villegas arranged to travel to Michigan with the help of his associate and alleged coconspirator Jon Jeannin, Jr. According to Jeannin, Sierra-Villegas had contacts in Arizona who could provide crystal methamphetamine. Sierra-Villegas and Jeannin had an arrangement under which Sierra-Villegas would sell meth to Jeannin in Kansas City at a discounted rate if Jeannin arranged for drivers to bring the meth from Arizona to Kansas City. Sierra-Villegas provided a green Ford Expedition, not registered under his name and fitted with hidden compartments, for this purpose. In early July, a driver returned from Arizona without meth. Sierra-Villegas told Jeannin he could get at least five pounds from Garcia in Michigan. The regular driver was unavailable, so Brent Kellerman, a coconspirator and associate of Jeannin's who did not know Sierra-Villegas, offered to go instead. On August 11, after the recorded call between the CI and Sierra-Villegas, Jeannin told Kellerman to make the trip and take Sierra-Villegas with him. Kellerman and Sierra-Villegas travelled to Michigan in the green Explorer, arriving on the morning of August 12. Kellerman and Sierra-Villegas first met up with Garcia and then with the CI. Through the CI, Sierra-Villegas and Garcia informed the undercover officer that they would only be able to sell 15 pounds of meth, and they wanted to do the transaction that day. As they prepared to make the deal, they became suspicious that police were following them and called off the deal. Garcia, Kellerman, and Sierra-Villegas then went to Streich's property in the green Expedition. There, Kellerman packed cash and methamphetamine that Streich had been storing in the barn into the hidden compartments in the wheel wells of the Expedition. Kellerman sealed the compartments with a product called Bondo.

The next morning, August 13, Kellerman began driving the Expedition back to Kansas City alone. Before he got far, he was pulled over by state police, who conducted a consented search and discovered the meth hidden in the wheel wells. The same day, Garcia had arranged for his wife, Rosa, to take Sierra-Villegas to the Chicago airport or to buy a car that Sierra-Villegas could drive back to Kansas City. Garcia gave Rosa $10,000 in cash that included some

marked bills from one of the transactions with the undercover officer. While looking at an SUV that was being offered for sale, Sierra-Villegas was stopped by police; he denied knowing about Rosa's cash and claimed he planned to use bank cards to get money to pay for the car. Streich and Garcia were also arrested on the same day. A search of Streich's property revealed five packages of crystal meth, a scale, and firearms. A search on August 15 of Sierra-Villegas's house in Kansas City yielded multiple firearms including two assault rifles, ammunition, a vacuum sealer, black rubber bands, black tape, and over $2,000 in cash in the master bedroom. In other parts of the house there was a further $11,000 in cash, Bondo, digital scales, and a money counting machine.

Sierra-Villegas was charged with one count of conspiracy to possess with intent to distribute and to distribute 500 grams or more of methamphetamine and one count of possession with intent to distribute 500 grams or more of methamphetamine. Streich, Jeannin, Garcia, and Kellerman were also charged, but all agreed to plead guilty and cooperate with the government before trial; all but Streich testified against Sierra-Villegas.

Sierra-Villegas testified in his own defense. Sierra-Villegas stated that he had moved out of the Kansas City house four months before he was arrested and moved to Arizona. He was renting out some of the house, but not the master bedroom. Prior to travelling to Michigan with Kellerman, he stayed two nights at the house. Sierra-Villegas said he owned the guns, but that they were not where he had left them when the house was searched on August 15, and that the other allegedly drug-related materials found in the house were not his. According to Sierra-Villegas, he had a substantial amount of non-drug related business with the CI, including owning racing horses and a planned purchase of a bar. He said that the recorded conversation with the CI related to the planned purchase of the bar, not to drugs. He also said that the directions he had texted to Garcia were for the location of a machine called a "trencher" that he was considering buying and wanted Garcia to check for him. Finally, Sierra-Villegas claimed that he travelled to Michigan in order to retrieve a deposit he had paid to the CI on a purchase for a horse that had fallen through. He denied having seen the green Expedition before. Sierra-Villegas denied all active involvement in meth trafficking in general and the conspiracy in particular.

At trial, the Government did not call the CI or seek to admit any of the CI's statements for their truth. However, because the Government presented evidence of the recorded phone call between Sierra-Villegas and the CI, Sierra-Villegas was able to identify who the CI was. Seeking primarily to impeach the CI, Sierra-Villegas sought to disclose the CI's identity on the record and call the CI as a witness. In particular, on the third day of trial, Sierra-Villegas filed a motion to compel the Government to disclose the identity of the CI; Sierra-Villegas had already obtained (though not yet served) a subpoena calling the CI to testify. After pressing counsel on whether there was any purpose to revealing information about the CI beyond discrediting him, the trial court denied the motion to compel and quashed the subpoena. To avoid having Sierra-Villegas attempt to call people connected to the CI or introduce evidence that would reveal his identity, the Government stipulated to the CI's horse racing activities and to Sierra-Villegas's prior interaction with the CI at the CI's racing track.

A jury found Sierra-Villegas guilty on both counts. The district court found a drug quantity of more than 11 kilograms beyond a reasonable doubt, based on the amount of meth seized in Michigan, which established a base offense level of 38 under the sentencing guidelines. Over Sierra-Villegas's timely objection, the district court also applied sentencing enhancements for firearms possession (based on the guns at Sierra-Villegas's Kansas City house), leadership role, and obstruction of justice (based on Sierra-Villegas's testimony at trial). The resulting offense level carried a guideline sentence of life, but the district court varied downward and sentenced Sierra-Villegas to 325 months, along with other penalties.

II.

The Government sought to block the public disclosure of the CI's identity that could arise through the admission of evidence and the CI's appearance to testify. In this respect the Government relied on the informant privilege, a concept recognized by the Supreme Court in *Roviaro v. United States*, 353 U.S. 53 (1957). The privilege is qualified; even where it would typically apply, information about a confidential informant (or the informant's testimony itself) may be admitted if the revealing evidence "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Id.* at 60-61. The district court here ruled that

the privilege applied and that the evidence Sierra-Villegas sought to produce was not so essential to his defense as to overcome the privilege. The court was correct on both points.

The government does not necessarily waive the informant privilege whenever the identity of the informant is known by the defendant, or even when the government has revealed it to the defendant. Such situations are best understood as partial disclosure, and some of the government's interest in protecting an informant's identity may remain. Therefore, the district court was correct to consider applying the privilege.

The dictum in *Roviaro* that Sierra-Villegas relies on—"once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable"[1]—must be understood in light of the purpose of the informant privilege: "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials, and, by preserving their anonymity, encourages them to perform that obligation." *Roviaro*, 353 U.S. at 60; *id.* at 59. Disclosure to those who might resent the informant's cooperation with law enforcement eliminates the privilege because such disclosure exposes the informant to potential harm, and the privilege is designed to shield the informant from harm that might arise from his or her cooperation. But so long as some potential harm from further disclosure or publication remains, the government retains an interest in non-disclosure and the privilege may still apply. Thus the language Sierra-Villegas relies on is merely an obiter dictum consistent with *Roviaro*'s central approach: "balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62. As in *Roviaro*, it is necessary here to determine the actual nature of the government's interest in maintaining whatever remains of the informant's anonymity in order to balance the factors at stake accurately. *See United States v. Evans*, 941 F.2d 267, 272 (5th Cir. 1991).

Although the Government has pointed to no specific threat to the CI, it is clear that the CI could potentially be harmed by disclosure. Without further disclosure, only Sierra-Villegas and

---

[1]This language is dictum because the Court explicitly declined to rely on the Government's assertion that the informant's name was known at least to the defendant. 353 U.S. at 60 n.8.

his alleged co-conspirators know who the CI is.[2]  Anyone else will have to rely on Sierra-Villegas's or the co-conspirators' word, which is very different from relying on the government's word.  The Government suggests that contributing to a $500,000 meth bust "breeds a lot of resentment" and that the informant might be involved in further investigations.  While one cannot infer that the CI would necessarily face retribution or other harm on these grounds alone, it is perfectly plausible that he might.  The Government also notes that the website whosarat.com documents publicly disclosed informants.  There is no information on the record suggesting that informants are harmed by their publication on this website, but publication—particularly with proof—may be harmful in itself and may lead to a wide range of threats.  The government's interest in protecting the flow of information to law enforcement includes the need to protect informants from vague and speculative threats, and even from reputational harms.  This need will more easily give way to a defendant's need to present an effective defense than the need to protect an informant from a ruthless mob bent on uncovering his identity, but the need still suffices for the application of the qualified privilege.

The district court properly rejected Sierra-Villegas's motion to compel without holding an in camera hearing, because Sierra-Villegas failed to identify how the CI's testimony could be of genuine assistance in his defense.  As we held in *United States v. Sharp*, 778 F.2d 1182, 1187 (6th Cir. 1985), an in camera hearing is not required when the defendant fails to identify how the informant's testimony could be relevant or helpful.  Sierra-Villegas bore the burden of demonstrating to the court "how disclosure of the informant would substantively assist in his defense." *United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1992).  Since he did not indicate that he would be able to meet this burden, the district court did not abuse its discretion in denying his motion without an in camera hearing.  *See Sharp*, 778 F.2d at 1187 (stating abuse of discretion standard).  Indeed, without such a showing, it is ordinarily not appropriate for the court to hold an in camera hearing or grant a motion to compel.  *Id*.

Generously interpreted, Sierra-Villegas presented two theories of relevancy to the district court.  Most explicitly, Sierra-Villegas argued, both in his appellate brief and before the district court, that he intended to "impeach" the credibility of the CI.  This is an invalid purpose because

---

[2]Sierra-Villegas's attorney apparently said the CI's name in open court, but the name has been redacted from publicly available court documents.

the CI did not testify and none of the CI's statements was offered for its truth at trial. The district court repeatedly instructed the jury not to give any weight to alleged statements by the CI. Thus the reliability of any of the CI's statements would not make any fact of consequence more or less likely; in other words, impeachment would have been irrelevant. *See* Fed. R. Evid. 401. That the original source of investigators' suspicions might have been untrustworthy has no bearing on the reliability of the evidence the investigators subsequently found.

Second, Sierra-Villegas suggested in his brief to the district court that the CI might have "framed" him. Sierra-Villegas does not elaborate, but presumably the allegation is that the CI arranged matters to make Sierra-Villegas appear guilty (that is, involved in the drug conspiracy) when in fact he was not. The CI might have done so, for example, by intentionally using common drug code words during his telephone call with Sierra-Villegas even when the CI knew that Sierra-Villegas thought the conversation was about something else. Testimony to this effect would have been relevant, but Sierra-Villegas was unable to provide more than speculation that the CI's testimony might support a framing theory. "Mere speculation" alone is not enough to overcome the privilege. *United States v. Jiles*, 658 F.2d 194, 197 (3d Cir. 1981). Although it is not impossible, it is implausible that the CI framed Sierra-Villegas in this sense or would testify to this effect. The purpose of the CI's call to Sierra-Villegas was to cause Sierra-Villegas to travel from Missouri to Michigan, where the drug deal was taking place; in this sense, the CI clearly intended the call to incriminate Sierra-Villegas. However, Sierra-Villegas does not identify how the CI could credibly testify to Sierra-Villegas's innocent understanding of that call. Even disregarding the fact that Sierra-Villegas's method of travel to Michigan and activity while there—matters outside of the CI's control—suggested that Sierra-Villegas's participation in the call was not innocent, Sierra-Villegas points to nothing that the CI might know that would bolster Sierra-Villegas's defense. Throughout trial, Sierra-Villegas was unable to support his framing theory except by noting that the CI owed him money.[3] On appeal, Sierra-Villegas makes no further specific claim about the CI's potential testimony. In some cases, the context makes it obvious that a confidential informant might provide testimony helpful to the defendant, but that is not the case here; the call itself was already in evidence, and it is unclear what context

---

[3]Sierra-Villegas also alleged that the CI had incentives, e.g., a tenuous immigration status, to cooperate with the government. But this kind of incentive does not indicate a motive to provide falsely incriminating information about Sierra-Villegas in particular.

the CI could provide that would color its interpretation. Under these circumstances, Sierra-Villegas did not provide more than speculation suggesting the CI's testimony could substantiate the framing theory. The district court did not abuse its discretion in declining to hold an in camera hearing on this basis. *See United States v. Dexta*, 136 F. App'x 895, 905 (6th Cir. 2005); *Jiles*, 658 F.2d at 197.

In response to a question immediately prior to the district court's decision on Sierra-Villegas's motion to compel, counsel for Sierra-Villegas confirmed that impeachment and supporting the framing theory were the only purposes for seeking disclosure of the CI. It is therefore not necessary to consider Sierra-Villegas's argument on appeal that the CI would have corroborated aspects of his defense—namely that he travelled to Michigan to attend to non-drug-related business with the CI and that he interpreted the recorded phone call with the CI as being about non-drug-related business—to the extent that this argument is distinct from the framing argument discussed above.[4]

The CI in this case was likely more involved in the charged conspiracy than a mere tipster would have been, but this does not in itself suggest that the CI's testimony would have been helpful to Sierra-Villegas. Although courts frequently refer to the degree of a CI's involvement, *see, e.g.*, *Sharp*, 778 F.2d at 1186 n.2 (citing cases), this factor does not have independent significance. In the end, the key consideration is whether the informant's involvement is such that his testimony would be helpful to the defendant at trial. *Roviaro*, 353 U.S. at 62. Thus, while the CI in this case was more than a "tipster," his involvement was not such that he would likely be in a position to offer testimony helpful to Sierra-Villegas.

III.

The three sentencing enhancements challenged by Sierra-Villegas were all warranted. First, the district court did not err in imposing a four-point sentencing enhancement for being an "organizer or leader" of the conspiracy under U.S.S.G. § 3B1.1(a). Our review regarding this

---

[4]Counsel's waiver of this argument was not ambiguous. The district court asked: "It's not as though the person is going to get on the stand in your view and say, 'Oh, I was on that call with Mr. Sierra-Villegas, but we were talking about horse farms'? . . . Rather you're going to put him on and impeach his credibility and say he's really the instigator of a frame-up?" Counsel replied, "I think that's realistic and accurate, Your Honor."

issue is deferential. *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013). Sierra-Villegas argues that because he did not initiate the conspiracy to sell methamphetamine in Michigan, he cannot be considered the leader of the conspiracy. But initiation is not dispositive; it is merely "significant in assessing . . . [the defendant's] 'exercise of decision making authority,' the 'nature of participation in the commission of the offense,' 'the degree of participation in planning or organizing the offense,' and 'the degree of control and authority exercised over others.'" *United States v. Lanham*, 617 F.3d 873, 890 (6th Cir. 2010) (quoting U.S.S.G. § 3B1.1, cmt. 4). There was sufficient evidence on these factors to prove that Sierra-Villegas was a leader of the conspiracy. Jon Jeannin, Jr. testified that Sierra-Villegas provided the car, registered under a different name, that the conspirators used to transport the methamphetamine; that only Sierra-Villegas had connections in Arizona, where the methamphetamine was sourced; and that he arranged (through Jeannin) for drivers to bring methamphetamine from there. Alejandro Garcia testified that he received a text message from Sierra-Villegas—which was itself admitted into evidence—giving him directions to the location where he received drugs to sell to the undercover officer. And when Garcia pulled out of the transaction with the undercover officer, Sierra-Villegas travelled to Michigan to facilitate the deal. These facts strongly suggest that Sierra-Villegas played a leadership role, organizing key features of the conspiracy and directing the actions of his coconspirators.

Sierra-Villegas's further suggestion that he did not behave in the way high-level drug dealers normally do—essentially because he did not better conceal his activities and isolate himself from the drugs—is at best circumstantial evidence of non-leadership and is not among the factors identified by the Sentencing Guidelines as distinguishing leadership from mere "management or supervision," which would warrant a lesser enhancement. U.S.S.G. § 3B1.1, cmt. 4. Accordingly, the district court did not err in imposing the four-point enhancement for leadership role.

The district court additionally did not err in imposing a two-point sentence enhancement for possession of firearms under U.S.S.G. § 2D1.1(b)(1). Sierra-Villegas admits that the guns found at his Kansas City home were his property and given to him by co-defendant Alejandro Garcia, but argues that the enhancement for possession of firearms does not apply because the

guns were unconnected with his offenses, conspiracy to possess with intent to distribute methamphetamine and possession with intent to distribute methamphetamine. However, the evidence at trial does not support his claim.

The government met its initial burden of establishing that Sierra-Villegas possessed the firearms during the commission of the offense. So long as Sierra-Villegas had "dominion or control" over the weapons or "dominion over the premises" where they were located, he had constructive possession of the firearms. *United States v. Sanchez*, 928 F.2d 1450, 1460 (6th Cir. 1991). Multiple guns and ammunition were found in the master bedroom of Sierra-Villegas's house shortly after Sierra-Villegas's arrest. Sierra-Villegas stayed in that house for two days before he left for Michigan, which is within the time period of the conspiracy. Although he claimed that someone else was also staying in the house, he admitted that no one else was using the master bedroom. *Id.* at 2377. Thus, he had dominion over the premises where the guns were located during the conspiracy.

Therefore, Sierra-Villegas had the burden to prove that "it was 'clearly improbable' that the weapon was connected to the offense." *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) (quoting *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996)). Sierra-Villegas was unable to meet this burden. Weighing against Sierra-Villegas is the following evidence. In the bedroom, in addition to the multiple guns and ammunition, police found personal documents of Sierra-Villegas's, a vacuum sealer and rolls, black rubber bands, a bag of marijuana, and, hidden under the mattress, over $2,000 in currency. In the house's basement and in a car in the garage, police found other materials commonly associated with drug trafficking, including over $10,000 in cash, digital scales, a white powder that may have been used as a cutting agent, and Bondo. Further, one of the co-conspirators testified that he would regularly transport large quantities of cash used in drug transactions to and from Sierra-Villegas at the house. All of this evidence strongly suggests that the weapons were connected to the drug distribution conspiracy, even in spite of the fact that the drugs were seized in Michigan, far from the guns in Kansas City. By contrast, we have held firearm possession to be unconnected with drug activity when the weapon was a hunting (rather than assault) rifle, there was evidence that the defendant had used it for hunting, the house was in a rural setting, the alleged operation involved drug manufacturing

rather than dealing, and the weapon was located separately from materials related to the alleged operation. *United States v. Zimmer*, 14 F.3d 286, 291 (6th Cir. 1994). None of those facts, or similar ones, is present here. The district court was therefore correct to apply the enhancement for firearms possession.

The district court also did not err in imposing a two-point obstruction-of-justice enhancement pursuant to U.S.S.G. § 3C1.1. Notwithstanding Sierra-Villegas's claim to the contrary, imposing the enhancement punishes Sierra-Villegas for testifying falsely, not for exercising his right to testify on his own behalf. In the sentencing hearing, the district court identified particular aspects of Sierra-Villegas's testimony that directly contradicted essential predicates of the jury's guilty verdict and independently found, by a preponderance of evidence, that Sierra Villegas had perjured himself. Preponderance of evidence is the correct standard. *United States v. Zajac*, 62 F.3d 145, 150 (6th Cir. 1995). Further, a court's finding must identify the predicates for a finding of perjury, *United States v. Dunnigan*, 507 U.S. 87, 95 (1993), and the district court here did so. The district court focused on the varying reasons Sierra-Villegas offered for travelling to Michigan, and it convincingly explained why it found these incredible. Assuming that Sierra-Villegas indeed intended to recover a $7,000 from the CI, this did not explain why he needed to travel to Michigan, or why he did not in fact recover any money from the CI while in Michigan. As the district court noted, the most reasonable interpretation is that Sierra-Villegas knowingly lied about his reason for travelling to Michigan. The court's finding of obstruction was supported by a preponderance of evidence. Thus applying the obstruction of justice enhancement was appropriate.

Finally, Sierra-Villegas challenges the reasonableness of his 325-month prison sentence on the sole ground that it is disproportionate in comparison to those of his coconspirator co-defendants, all of whom agreed to plea bargains and cooperated with the government. However, Sierra-Villegas cannot carry his burden of showing that the sentence was unreasonable. The district court imposed a below-guidelines sentence, and such sentences are presumptively reasonable. *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008). As Sierra-Villegas acknowledges, under 18 U.S.C. § 3533(a)(6) the district court may consider the defendant's sentence in comparison with that of co-defendants at sentencing, but need not do so; it is a matter

of discretion. *United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007). At Sierra-Villegas's request, the district court did take into account potential disparities between co-defendants. The court found that the differences in sentences were caused primarily by the application of the sentencing guidelines and that each sentence was justified under the statutory factors, and there was thus "fair comparability" among the sentences. Sierra-Villegas does not dispute that the application of the guidelines, and in particular reductions for acceptance of responsibility and substantial assistance, caused the apparent discrepancy.[5] Lighter sentences for Sierra-Villegas's coconspirators are justified, because "[a]cceptance of responsibility and the decision to cooperate with the government are legitimate considerations for courts to consider when sentencing." *United States v. Greco*, 734 F.3d 441, 451 (6th Cir. 2013). Further, eliminating inconsistencies among co-defendants might be in tension with the statutory purpose, embodied in 18 U.S.C. § 3533(a)(6), of limiting "*national* disparities among . . . defendants with similar criminal backgrounds convicted of similar criminal conduct." *Simmons*, 501 F.3d at 623 (emphasis added). To lower Sierra-Villegas's sentence to bring it in line with co-defendants who committed similar crimes but cooperated with prosecutors and police would bring it out of line with defendants in other cases in which there were no cooperating co-defendants. Under these circumstances, the district court did not abuse its discretion in sentencing Sierra-Villegas to a below-guidelines sentence of 325 months.

For the foregoing reasons, we **AFFIRM** Sierra-Villegas's conviction and sentence.

---

[5]Sierra-Villegas does claim that Alejandro Garcia and Jon Jeannin, Jr. were "leaders" of the conspiracy, so their sentences were out of line with Sierra-Villegas's. But this is contrary to the finding of the district court that they were not leaders. Sierra-Villegas received enhancements for obstruction of justice and leadership, while the other defendants received reductions for acceptance of responsibility and substantial assistance.