RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0201p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 14-2600

JEFFREY DEWITT DOXEY, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:13-cr-00235—Paul Lewis Maloney, District Judge.

Argued:  June 9, 2016

Decided and Filed:  August 18, 2016

Before:  KEITH, CLAY, and WHITE, Circuit Judges.

_____

### COUNSEL

**ARGUED:**  Amanda Urban, UNIVERSITY OF MICHIGAN LAW SCHOOL FEDERAL APPELLATE LITIGATION CLINIC, Ann Arbor, Michigan, for Appellant.  Sally J. Berens, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.  **ON BRIEF:**  Amanda Urban, UNIVERSITY OF MICHIGAN LAW SCHOOL FEDERAL APPELLATE LITIGATION CLINIC, Ann Arbor, Michigan, Dennis G. Terez, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, Melissa M. Salinas, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Toledo, Ohio, for Appellant.   Jeff J. Davis, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

---

**OPINION**

---

CLAY, Circuit Judge.    Defendant Jeffrey Doxey, Jr. appeals his jury conviction and sentence for possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1). This case arises from police officers' search of Doxey, during which they found a bag of heroin protruding from in-between his buttocks.    On appeal, Doxey raises a Fourth Amendment challenge to the search of his person and the seizure of the heroin, argues that the identity of a confidential informant should have been revealed, and challenges his career offender designation at the time he was sentenced.    For the reasons set forth below, we **AFFIRM** the district court.

**BACKGROUND**

*Factual Background*

This case resulted from an investigation by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") into the theft of a number of firearms from two Michigan gun dealers in June and July 2013.    The ATF investigation led to the arrests of Joseph Sweet and Ronald Patrick Cook, both of whom admitted to trading the stolen firearms with Doxey, their drug dealer, in exchange for heroin and cash.    With this information, ATF Special Agent Jack Smith contacted the Michigan State Police West Michigan Enforcement Team ("WEMET"), a multi-jurisdictional narcotics task force, for help in investigating Doxey.

On May 29, 2013, Doxey was paroled from the Michigan Department of Corrections for his 2001 conviction for delivery of less than 50 grams of cocaine.    According to his presentence investigation report ("PSR"), Doxey initially received probation for that offense in 2001, but he violated his probation and was sentenced to a term of imprisonment.

In addition to the information from Special Agent Smith, WEMET officers received information on July 30, 2013 from a confidential informant ("CI") connecting Doxey with drug trafficking.    The CI told the officers that Doxey was a heroin dealer who drove a white Suburban

with rust along the bottom of it.  The CI also said that Doxey had possessed a large quantity of heroin within the past twenty-four hours.

Later that same day, WEMET officers, who had been looking for Doxey, located him at a gas station in Muskegon Heights, Michigan.  The officers observed Doxey—who they knew was on parole—engage in an apparent "hand-to-hand" narcotic transaction with another man from the white SUV Doxey was driving.  (R. 52, Suppression Hearing Transcript, PageID# 162.)  The officers then watched Doxey drive away with two female passengers inside.  Because Doxey had a suspended license, the officers planned to stop the SUV.  But before the officers could pull Doxey over for the violation, Doxey pulled over to the side of the road.  One of the WEMET officers, Trooper Marshall, pulled up behind Doxey in an unmarked black Dodge Caravan.  As Trooper Marshall pulled up behind the SUV, Doxey was already getting out of his car.  Trooper Marshall approached Doxey and told him he needed to speak with him.  Doxey was cooperative and accompanied Trooper Marshall to the back of the SUV.

At some point, other WEMET officers arrived, and one of them, Lieutenant Fias, searched Doxey with his consent.  Lieutenant Fias removed $1,560 in cash from Doxey's pants pocket.  When questioned, Doxey said his girlfriend, Nancy Todd, gave him some of the money and that the remaining money was gambling proceeds.  The other officers searched the car Doxey had been driving.

During the search, Trooper Marshall found a partially burnt marijuana cigarette and a digital scale in the center console of the car.  The officers also questioned the two passengers, but did not ask them about the evidence taken from the car.

The officers then took Doxey to Todd's house, where Doxey was living at the time.  Todd provided the officers with written consent to search her house.  The officers searched Todd's house and found in the kitchen a glass Pyrex jar which contained heroin residue.  The officers also found baking soda, which, as they later testified, is commonly used to dilute heroin.  At that point, the officers *Mirandized* Doxey and questioned him about the drugs found in the house and car.  Doxey denied that any of the items found by the officers belonged to him and said that the items found in the house likely belonged to Todd's ex-boyfriend.

While still inside Todd's house, the officers asked Doxey if he would consent to another search of his person, and Doxey agreed. Because the officers suspected that Doxey was hiding drugs in his genital area, they asked him to remove his underwear and squat so that his genitals and his rectum could be examined. Trooper Marshall explained that "it [i]s quite common for people that are trafficking narcotics or trying to [hide] any type of narcotics for people to try and hide them on their person so police officers can't find them." (R. 93, Jury Trial Transcript, Volume II, PageID# 720.)

Doxey initially complied by pulling his pants and underwear down. But when the officers asked him to squat down, Doxey was "reluctant to do that." (*Id.* at 761.) Instead, Doxey "would squat just a little bit, like it was quite evident he was clenching his butt cheeks together in order to hide something, to prevent something to fall out." (*Id.* at 721.) Because it was obvious to the officers that Doxey was hiding drugs in his rectum, they decided to take him to the Muskegon Police Department for another search.

At the police department, Lieutenant Fias contacted Doxey's parole officer and learned that as a condition of his parole, Doxey was required to allow complete searches of his person by law enforcement officers. Lieutenant Fias explained this to Doxey, and Doxey again allowed the officers to search him. But Doxey continued to attempt to hide whatever it was that was in his rectum: "he was trying to back into the wall, wouldn't squat down, just going out of his way to not . . . relax his butt cheeks." (R. 52 at 167.) The officers had removed Doxey's handcuffs after he consented to the search, but Doxey became combative with the officers during the search and had to be physically restrained. Once the officers were able to restrain Doxey, they could see "the corner tie bag in between his butt crack." (*Id.*) Trooper Marshall explained how he retrieved the plastic bag from in-between Doxey's buttocks:

> I told [the other officers] I saw the plastic, and they said go ahead and get it. At that point, [Doxey] was fighting and he rolled away from me and I was unable to get it. So [the other officers] were able to turn [Doxey] back around so I could actually flick it out of his butt cheeks with my finger, and he [was] taken into custody at that point.

(*Id.* at 135.)

A field test confirmed that the substance in the plastic bag was heroin, and a forensic scientist for the Michigan State Police confirmed at trial that the substance was heroin weighing 8.17 grams.

### *Procedural Background*

Doxey was originally charged with state crimes, but the case was taken over by federal prosecutors. On November 20, 2013, a federal grand jury charged Doxey with possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Over the course of several motions hearings, the district court granted two requests by Doxey for new counsel, but denied his third such request.

### A.      Doxey's Motion for Disclosure of CI's Identity

In March 2014, Doxey's second attorney filed a motion to disclose the identity of the CI. In his motion, Doxey argued that disclosure of the CI's identity would allow him to assess the strength of the government's case. His motion stated that "[w]ithout this information, [Doxey] is unable to make an informed decision regarding proceeding to trial." (R. 28, Brief in Support of Motion for Disclosure of Informant's Identity, PageID# 46.) The government opposed the motion, arguing that the CI was "merely a tipster." (R. 29, Response to Motion for Disclosure, PageID# 54.)

At a final pretrial conference, Doxey's third and final attorney asked the district court to rule on the arguments in the brief submitted by Doxey's prior counsel. The district court denied the motion to disclose the CI's identity on the ground that disclosure was not necessary to ensure Doxey obtained a fair trial. The district court reasoned that because the CI's role was limited to providing information without further participation, this was not an exceptional circumstance requiring disclosure.

### B.      Doxey's Motion to Suppress

In June 2014, Doxey filed a motion to suppress the evidence, including the drugs found on him. In his motion, Doxey challenged the stop of his vehicle and argued he did not consent to the search of his vehicle or person. Alternatively, Doxey argued if he did consent, the consent

was involuntary. Doxey did not specifically argue that a warrant was required for the bag of heroin retrieved from in-between his buttocks. Instead, Doxey argued that the initial traffic stop and initial search violated the Fourth Amendment and that therefore, all evidence subsequently obtained should have been suppressed as fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471 (1963). (R. 40, Brief in Support of Motion to Suppress, PageID# 82, 84.) The government opposed the motion, arguing that there was no traffic stop to begin with, that Doxey consented to each of the searches, and that the body search was justified as a parole search.

At the suppression hearing on July 16, 2014, the government called three witnesses: Agent Staple, a Michigan Department of Corrections parole officer; Trooper Marshall; and Lieutenant Fias. Trooper Marshall and Lieutenant Fias testified about the events leading to Doxey's arrest on July 30, 2013. Agent Staple testified that he supervised Doxey's parole, and explained that as a condition of his parole, Doxey was required to "voluntarily consent to a search of [his] person and property upon demand by a peace officer or parole officer," with the only limitation being that a search could not be conducted for purposes of harassment or intimidation. (R. 52 at 119-22.) Agent Staple also explained that Doxey was prohibited from driving as a condition of his parole.

Against the advice of his counsel, Doxey chose to take the stand on his own behalf. During his examination and cross-examination, Doxey claimed he stopped his car because another car was following closely behind and that Trooper Marshall jumped out of his car, gun drawn, yelling, "State Police. Put the car in park." (*Id.* at 179-80.) Doxey testified that he did not consent to the officer's search of his vehicle, but that he consented to a search of his person. Doxey then gave the following testimony about what had occurred at the police department:

> I never consented to [a third body search]. They took the handcuffs off me, sir, and they asked me for consent. I told them during the interview I said I told them call my [parole officer], because I know I got [to] consent. I knew I got to consent to search my person, got to let you three times, why I got to give a strip search, and when I denied that, that was when they were determined to get a strip search on me, so they took the handcuffs off, and they told me that either you [are] going to consent to a strip search or we [are] going to do it anyway. And I never consented, so that's when they went-- they just one grabbed, had this arm

and one had this arm, they had my legs, they just pulled me each way and Detective Fias stuck his hand and stuck his finger in my behind and--

(*Id.* at 187.)

The district court credited the officers' testimony over that of Doxey's. The district court then denied Doxey's motion to suppress, finding that the officers' actions did not violate the Fourth Amendment. The district court first found that Doxey consented to the initial search of both his person and his vehicle. The district court also found that the officers' subsequent searches of Doxey's person were justified as parole searches. With respect to the station house search, the district court summarized this point by noting:

> [Doxey] is taken to the police department at some point in time. Prior to an additional search of Mr. Doxey, contact with his parole officer is made, the officers become armed with . . . specific information that Mr. Doxey is required to consent to a search of his person, and a search of his person is then performed while he is at the police station and the nine grams of heroin are found in Mr. Doxey's butt cheeks.

(*Id.* at 208.)

The district court concluded by asking if either party wanted additional factual findings and legal conclusions regarding its ruling, but neither party did.

### C.     Jury Trial

A jury trial began on August 19, 2014. Among other things, the government's witnesses testified about the CI's tip, the officers' contact with Doxey on July 30, 2013, the paraphernalia suggesting intent to distribute, and the bag of heroin retrieved from in-between Doxey's buttocks. Doxey did not put on any evidence or testify at trial. On August 20, 2014, the jury found Doxey guilty of possession of heroin with intent to distribute.

### D.     Sentencing

Doxey's sentencing hearing was held on December 17, 2014. The PSR recommended application of the career offender guideline because Doxey was at least eighteen years old at the time of the offense of conviction (he was thirty-one); the offense of conviction was a felony controlled substance offense; and Doxey had previously been convicted of two felonies that were

either controlled substance offenses or crimes of violence. *See* U.S.S.G. § 4B1.1(a). As the predicate offenses, the PSR identified two state convictions: a 2001 conviction for delivery of less than 50 grams of cocaine (Doxey was seventeen years old at the time of conviction), and a 2002 conviction for delivery of less than 50 grams of cocaine. The PSR also listed as a career offender predicate offense Doxey's 2011 conviction for third-degree fleeing and eluding a police officer.

Application of the career offender guideline increased Doxey's offense level from 12 to 34. Doxey's offense level of 34 and his Criminal History Category of VI resulted in a guideline range of 262 to 327 months. Absent the higher offense level required by the career offender guideline, Doxey's criminal history category would still have been Category VI, based on 16 criminal history points.

At sentencing, Doxey objected to application of the career offender enhancement on the basis that his two state drug convictions did not qualify as controlled substance offenses because of the minimal amount of drugs involved. But the district court rejected this argument:

> As far as the career offender status is concerned, the defendant has the requisite prior predicate offenses for treatment under the guidelines as a career offender. I recognize his position, and I assume it to be true, that his prior convictions dealt with small amounts of controlled substances, but nevertheless, he has been convicted of state felonies which meet the definition for the predicates for career offender. He has at least two predicates, so recognizing that those, in terms of the amounts, were perhaps minor in Mr. Doxey's eye, they are captured by an application of the career offender guideline. So in the Court's judgment, he is properly classified as a career offender.

(R. 95, Sentencing Hearing, PageID# 851-52.)

Doxey did not object to the use of the 2011 fleeing and eluding conviction as a predicate offense for a career offender enhancement. The district court ultimately sentenced Doxey to 235 months imprisonment, and Doxey now appeals.

**DISCUSSION**

I.      **Search of Doxey's Person**

      *a.  Standard of Review*

Doxey raises a new argument on appeal that he did not present to the district court: that the warrantless invasive search of his anal cavity offended the Fourth Amendment. First, because Doxey did not raise this specific issue below, we must determine if Doxey either waived or forfeited the issue. "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano,* 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938)).

As we explained in *United States v. Lopez-Medina,* "we have applied [Federal Rule of Criminal Procedure] 52(b)'s plain error review to new suppression arguments raised for the first time on appeal after a defendant's original suppression arguments proved unsuccessful at the trial court level." 461 F.3d 724, 739 (6th Cir. 2006) (citing *United States v. Critton,* 43 F.3d 1089, 1094 (6th Cir. 1995)); *see also United States v. Bucio-Cabrales,* 635 F. App'x 324, 330-31 (6th Cir. 2016) (applying plain error review to a suppression argument raised for the first time on appeal).

Doxey filed a motion to suppress the search of his vehicle and person, but did not specifically argue that a warrant was required for the bag of heroin retrieved from in-between his buttocks. Doxey's motion was unsuccessful because the district court ruled that as a condition of his parole, Doxey was required to consent to searches of his person. Thus, Doxey did not completely fail to file a pretrial suppression motion. Instead, he filed an unsuccessful motion and now raises a new suppression argument for the first time on appeal. Therefore, we review Doxey's argument only for plain error. *See* Fed. R. Crim. P. 12(b), 52(b); *Lopez-Medina,* 461 F.3d at 739. An error is plain only when "it is obvious, affects substantial rights, and seriously affects the fairness or integrity of judicial proceedings." *Lopez-Medina,* 461 F.3d at 739 (citing *Johnson v. United States,* 520 U.S. 461, 466-67 (1997)).

But there is an even bigger problem with Doxey's new argument: he misframes the issue when he argues that he was subjected to a rectal cavity search. That is a misleading statement of the issue since there is no evidence in the record that the officers conducted an invasive search of Doxey's anal cavity. Doxey never argued before the district court that he was subjected to an invasive rectal cavity search. In fact, even in his suppression motion, all Doxey said was that he "did not consent and resisted the search, but eventually the police recovered a baggy from . . . [his] buttocks." (R. 40 at 81.) And Doxey's single ambiguous statement in testimony that "Detective Fias stuck his hand and stuck his finger in my behind," without any elaboration, cannot reasonably be construed as an invasive rectal cavity search. (R. 52 at 187.)

Regardless of Doxey's characterization, however, the district court credited the officers' testimony over that of Doxey's and we are required to consider the evidence most favorably to the government. *See United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc) ("When reviewing the denial of a motion to suppress evidence, the appellate court must consider the evidence in the light most favorable to the government."); *see also United States v. Hill*, 195 F.3d 258, 264-65 (6th Cir. 1999) ("[W]e must give deference to the district court's assessment of credibility inasmuch as the court was in the best position to make such a determination."). We will disturb the district court's factual findings only for clear error. *United States v. Hinojosa*, 606 F.3d 875, 880 (6th Cir. 2010). Therefore, we reject Doxey's factual argument that he was subjected to an invasive rectal cavity search. The record, viewed in the light most favorable to the government, unambiguously shows that Trooper Marshall "flick[ed]" a baggie out from in-between Doxey's buttocks only after a lawful visual inspection revealed the baggie in plain sight. (R. 52 at 135.)

### b. *Analysis*

The starting point in the analysis of a challenged search is to note that "a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (ellipses in original) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). However, "the warrant and probable cause requirements generally do not apply to

searches of parolees, probationers or their residences." *United States v. Smith*, 526 F.3d 306, 308 (6th Cir. 2008) (citing *Samson v. California*, 547 U.S. 843, 857 (2006)).

In evaluating a search of a parolee, we apply a two-step test. *United States v. Loney*, 331 F.3d 516, 520 (6th Cir. 2003). First, we "examine whether the relevant regulation or statute pursuant to which the search was conducted satisfies the Fourth Amendment's reasonableness requirement." *Id.* As a parolee in Michigan, Doxey was subject to a warrantless search if an officer had "reasonable cause to believe that a violation of parole exists." Mich. Admin. Code § R 791.7735(2). As we explained in *Loney*, "it is now beyond question that a state statute survives Fourth Amendment scrutiny if it authorizes searches of parolees based on a reasonable suspicion that an individual is violating the terms or conditions of parole," 331 F.3d at 520-21, and Michigan's "reasonable grounds standard mirrors . . . the federal reasonable suspicion standard," *see id.* at 521 (internal quotation marks omitted) (addressing Ohio statute); *see also United States v. Wright*, 332 F. App'x 257, 259 (6th Cir. 2009) (upholding Ohio statute employing similar language); *Samson*, 547 U.S. at 846 (upholding California's more intrusive parole regulations, which require parolees to agree to be subject to search "with or without a search warrant and with or without cause.").

Because the statute itself is reasonable, the second question is "whether the facts of the search itself satisfy the regulation or statute at issue." *Loney*, 331 F.3d at 520. Stated otherwise, we ask whether the officers had reasonable grounds—or reasonable suspicion—to suspect that Doxey was violating the terms and conditions of his parole. *Id.* at 521. Reasonable suspicion "is based on the totality of the circumstances and has been defined as requiring 'articulable reasons' and 'a particularized and objective basis for suspecting the particular person . . . of criminal activity.'" *United States v. Payne*, 181 F.3d 781, 788 (6th Cir. 1999) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

The reasonable suspicion standard was satisfied in this case. The WEMET officers received information from a CI that Doxey was a heroin dealer who drove a white Suburban with rust along the bottom of it. The officers then corroborated that information by conducting surveillance of Doxey, where they observed him engage in an apparent hand-to-hand narcotic transaction with another man from a vehicle that matched the description of the vehicle given by

the CI. What the officers saw—Doxey engaging in an apparent drug transaction—supported a reasonable suspicion that he was not complying with the conditions of his parole. Even without seeing the apparent drug transaction, the officers also had reasonable suspicion once they saw him driving, as Doxey had a suspended license and so could not legally drive his vehicle. Either way, the officers were justified in conducting a warrantless search of Doxey pursuant to Michigan Administrative Code § R 791.7735(2).[1]

The next question in the analysis is one of reasonableness, because "[e]ven if a warrant is not required, a search . . . must be reasonable in its scope and manner of execution." *Maryland v. King*, 133 S. Ct. 1958, 1970 (2013). The reasonableness analysis is determined by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quotation omitted). Reasonableness depends upon "whether the totality of the circumstances justifie[s] a particular sort of search or seizure." *Id.* at 8-9.

Searches that intrude into the body implicate greater constitutional concerns. *See Schmerber v. California*, 384 U.S. 757, 770 (1966) ("Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned."). A warrantless search of a person's body implicates the "most personal and deep-rooted expectations of privacy," *Winston v. Lee*, 470 U.S. 753, 760 (1985), and is reasonable only if it falls within one of the Fourth Amendment's exceptions, *Missouri v. McNeely*, 133 S.Ct. 1552, 1558 (2013). However, "[t]he fact that an intrusion is negligible is of central relevance to determining reasonableness." *King*, 133 S. Ct. at 1969.

---

[1]One of Doxey's arguments on appeal is that although consent to search was a condition of his parole, he could withdraw his consent at any time and accept the consequences, *i.e.*, incarceration. First, Doxey never argued before the district court, as he does now on appeal, that he withdrew his consent to be searched and, therefore, waived this argument. *See United States v. Scarborough*, 43 F.3d 1021, 1025 (6th Cir. 1994) (arguments not raised below are generally waived on appeal). But even absent such a waiver, Doxey would lose on the merits of this issue because he does not point to, and we are unaware of, any case in which a court has found that a parolee can withdraw his consent at any time. Indeed, allowing a parolee to withdraw his consent would defeat the state's "overwhelming interest in supervising parolees because they are more likely to commit future criminal offenses." *Samson*, 547 U.S. at 844 (internal quotation marks and citation omitted). As we explained in *Smith*, "a State's ability to release individuals into [the community] depends on its ability to supervise the inmates effectively, enforce the conditions of confinement and protect the public from recidivist offenders." *Smith*, 526 F.3d at 310 (citation omitted).

Moreover, as the Supreme Court has pointed out, "[t]he expectations of privacy of an individual taken into police custody necessarily are of a diminished scope . . . A search of the detainee's person when he is booked into custody may involve a relatively extensive exploration, including requiring at least some detainees to lift their genitals or cough in a squatting position." *Id.* at 1978 (internal quotation marks, brackets, and citations omitted). Therefore, "[o]nce an individual has been arrested . . . his or her expectations of privacy and freedom from police scrutiny are reduced." *Id.*

There is no question in this case that Trooper Marshall's flicking a baggie from in-between Doxey's buttocks invaded Doxey's privacy interests beyond that of a visual search. Trooper Marshall's removal, however, did not require any further touching, intrusion, or probing into Doxey's body. Unlike the cases Doxey cites, namely, *United States v. Booker*, 728 F.3d 535 (6th Cir. 2013), this is not a case where the officers probed inside Doxey's anal cavity based on the belief that he might be hiding something inside. For example, in *Booker*, the defendant was injected with muscle relaxants, a sedative, and a paralytic agent before being paralyzed and intubated. *Id.* at 539. When the defendant was paralyzed with a tube in his throat, a doctor removed a five-gram rock of crack cocaine from his rectum. *Id.* This case is hardly analogous. Unlike in *Booker*, the officers here did not subject Doxey to an extremely intrusive medical procedure before removing something secreted in his anal cavity. What happened here was a far more limited intrusion upon Doxey's privacy interest and was based on the presence of a baggie in plain sight.

Additionally, unlike in *Booker*, there is nothing in the record related to the danger of flicking the protruding baggie from in-between Doxey's buttocks, nor did Doxey argue that he was at risk for injury or that he was injured by the removal. Instead, the record shows that the baggie was protruding far enough out of Doxey's buttocks so that Trooper Marshall could flick it with his finger, and there is no indication that this process was difficult or prolonged.

Finally, the fact of Doxey's status as a parolee diminished his reasonable expectation of privacy and provided a strong justification for the search. Just as the Supreme Court held in *Samson*, the government "has an overwhelming interest in supervising parolees because they are more likely to commit future criminal offenses." 547 U.S. at 844 (internal quotation marks

omitted). And the government's interests in reducing recidivism and promoting rehabilitation "warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Id.*

Doxey of course was a parolee who consented to a body search and even voluntarily pulled his pants and underwear down so that the officers could examine his genitals and rectum. Doxey only went "out of his way . . . not to relax his butt cheeks" once it became obvious to the officers that he was hiding something in his rectum. (R. 52 at 167.) Although removing the baggie protruding from Doxey's buttocks was an invasion of privacy beyond that caused by a visual search, what occurred here was a constitutionally permissible search that was reasonable under the totality of the circumstances. The bottom line is that the baggie was removed from in-between Doxey's buttocks without any intrusion into his anal cavity, without any injury, harm, or pain to Doxey, and in a private environment. We therefore find that the manner of removal was permissible under the Fourth Amendment and the district court's denial of Doxey's suppression motion was not plain error.[2]

## II.    Doxey's Request to Compel Disclosure of the CI's Identity

### a.  Standard of Review

Doxey next contends that the district court erred by denying his request to order the government to disclose the identity of the CI. The denial of a motion to compel the disclosure of a confidential informant is reviewed for abuse of discretion. *United States v. Sierra-Villegas*, 774 F.3d 1093, 1099 (6th Cir. 2014). "A district court abuses its discretion when it applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous

---

[2]The government also argues inevitable discovery, asserting that Doxey would have been strip-searched, and the drugs discovered, at the local jail. We have held that "the inevitable discovery exception to the exclusionary rule applies when the government can demonstrate *either* the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002) (internal quotation marks and citations omitted) (emphasis in original). The government can satisfy this burden by "showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." *Id.* (internal quotation marks and citations omitted). While it is certainly possible that the Muskegon County Jail routinely strip-searches incoming detainees as part of its intake processing, and that the drugs would have been discovered at that time, there is no evidence in the record about the Muskegon County Jail's procedures. The record therefore lacks sufficient evidence from which to make this determination. Given these uncertainties, we decline to rule on the government's inevitable discovery argument.

findings of fact." *United States v. Pugh*, 405 F.3d 390, 397 (6th Cir. 2005) (internal quotation marks and citations omitted).

### b. Analysis

The government has a limited privilege to withhold the identity of a confidential informant from a criminal defendant. *Roviaro v. United States*, 353 U.S. 53, 59-60 (1957). This privilege is limited, however, by "the fundamental requirements of fairness." *Id.* at 60. When "disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60-61. To determine whether the government is required to disclose the identity of the informant, we balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62. This depends "on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.*; *see also United States v. Sales*, 247 F. App'x. 730, 734 (6th Cir. 2007) ("[T]o invoke this privilege[,] the public interest in protecting the flow of information to the government must outweigh the defendant's need for disclosure of information in the preparation of a defense.") (internal quotation marks and citations omitted).

The question of disclosure is generally left to the district court's discretion. *United States v. Sharp*, 778 F.2d 1182, 1187 (6th Cir. 1985) (per curiam). Further, "[m]ere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure." *Id.* (citation omitted). We usually deny disclosure when the informer was not a participant in the underlying alleged crime, and instead "was a mere tipster or introducer." *Id.* at 1186 n.2. "A defendant must provide some evidence that disclosure of the informant's identity would assist in his defense before disclosure will be warranted." *United States v. Ray*, 803 F.3d 244, 274 (6th Cir. 2015); *see also United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1992) (affirming the district court's refusal to compel disclosure of the identity of a confidential informant because the defendant "advanced no more than a simple statement that [the informant's] testimony might assist in his defense," stating that "[a]n informant must be disclosed only upon a showing by the defendant that disclosure is essential to a fair trial.");

*Sharp*, 778 F.2d at 1187 (holding that the district court abused its discretion by ordering disclosure of informant's identity based solely on defense counsel's unsworn representations that disclosure would be relevant and helpful to his defense).

In this case, the district court acted well within its discretion in allowing the government to withhold the identity of its CI. In Doxey's motion, he failed to demonstrate how disclosure of information about the CI would "substantively assist his defense" or that disclosure was "essential to a fair trial." *Moore*, 954 F.2d at 381; *Sales*, 247 F. App'x. at 734. Instead, Doxey merely argued that disclosure of the CI's identity would allow him to assess the strength of the government's case and that "[w]ithout this information, [he] is unable to make an informed decision regarding proceeding to trial." (R. 28 at 46.) Nor has Doxey demonstrated on appeal how the CI's testimony could be of genuine assistance in his defense. The gist of his argument is that without the information from the CI, the police would never have made a case against him. Doxey's brief even suggests that the police would never have found him without the CI's statements. But the record completely contradicts this argument.

The extent of what the CI told the police was that Doxey was a heroin dealer who drove a white Suburban with rust along the bottom of it and that he had possessed a large quantity of heroin within the past twenty-four hours. However, by the time the CI informed police about Doxey, the police were already investigating him. After all, the police learned about Doxey after two robbery suspects admitted to trading stolen firearms with Doxey, their drug dealer, in exchange for heroin and cash. This is what led to the investigation of Doxey—the CI's tip played only a small part.

It is more accurate to say that the only record evidence of the role played by the CI in this case is that the CI supplied the information to police that ultimately led to a search. *See United States v. Beals*, 698 F.3d 248, 270 (6th Cir. 2012) (concluding that the district court was within its discretion not to order disclosure of the government's confidential informant where the informant only "helped orchestrate the search that led to discovery of incriminating evidence, not the crimes themselves," and "could not testify to any relevant fact."). Similar to *Beals*, the CI in this case was merely a tipster, and not "an active participant in the events underlying [Doxey's] potential liability." *Sharp*, 778 F.2d at 1186 n.2. Doxey was not charged because of something

the CI witnessed or was a part of; he was charged because of the paraphernalia suggesting intent to distribute and the bag of heroin retrieved from in-between his buttocks.[3]

Doxey's Sixth Amendment argument, that he should have been allowed to confront and impeach the credibility of the CI, is likewise without merit. The CI did not testify and none of the CI's statements were offered for their truth at trial. The district court explained this to the jury and specifically instructed them that they could not consider the CI's statements for their truth, but rather for the effect on what the officers did next:

> Ladies and gentlemen, you are about to hear some testimony that is not being offered for the truth of the matter of what the officer was told, but rather what the officer did as a result of gaining the information.

(R. 92, Jury Trial Transcript, Volume I, PageID# 583.)

Because the CI's statements did not come in for the truth, the CI's reliability "would not make any fact of consequence more or less likely." *Sierra-Villegas*, 774 F.3d at 1099. Impeachment would therefore have been irrelevant. That the original source of the officers' suspicions might have been untrustworthy "has no bearing on the reliability of the evidence the[y] subsequently found." *Id.* at 1100.

Moreover, the CI's statements were clearly contextual and provided to the jury only as background to the events leading up to Doxey's arrest, and not as evidence of his guilt. Therefore, the "confrontation right was not implicated because the testimony was provided merely by way of background." *Sales*, 247 F. App'x. at 735 (internal quotation marks and citations omitted). There was no violation of Doxey's Sixth Amendment right to confront his accusers because the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* (internal quotation marks and citations omitted). The district court therefore did not abuse its discretion in denying Doxey's motion to disclose the CI's identity.

---

[3]Doxey also argues—for the first time on appeal—that knowing the CI's identity would have allowed him to challenge the initial search of his vehicle. However, the district court found that Doxey consented to that search, and that finding is not clearly erroneous.

**III.     Application of the Career Offender Guideline**

   *a.  Standard of Review*

Doxey argues for the first time on appeal that using the 2001 conviction for delivery of less than 50 grams of cocaine violates his rights to equal protection and due process.  He also argues, for the first time on appeal, that his conviction for third-degree fleeing and eluding a police officer cannot be used as a predicate offense to establish career offender status in light of the Supreme Court's ruling in *Johnson v. United States*, 135 S. Ct. 2551 (2015) (holding that the Armed Career Criminal Act's ("ACCA") residual clause is void for vagueness).

As an initial matter, the parties dispute our standard of review on appeal.  Doxey asserts that we review *de novo* whether the district court properly sentenced him as a career offender.  The government agrees that review is ordinarily *de novo* but argues that because Doxey failed to raise these specific arguments before the district court, they are reviewed only for plain error.

The law in this circuit is clear that the failure to raise a constitutional challenge before the district court results in plain error review.  *See United States v. Graham*, 622 F.3d 445, 455 (6th Cir. 2010); *United States v. Oliver*, 397 F.3d 369, 377 (6th Cir. 2005); *United States v. Murillo-Monzon*, 240 F. App'x 43, 46 (6th Cir. 2007).  There is no question that Doxey's arguments are constitutional.  Therefore, because Doxey failed to raise these constitutional challenges before the district court, we review them only for plain error.[4]  To obtain relief under that standard, Doxey must establish "(1) error, (2) that is plain, and (3) that affects substantial rights." *Johnson*, 520 U.S. at 466-67.  If he can show all three conditions, this Court will "exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 467 (alteration in original). "Meeting all four prongs is difficult, 'as it should be.'" *Puckett v. United States*, 556 U.S. 129, 135 (2009) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004)).

---

[4]Although Doxey was sentenced before *Johnson*, he still bears the burden of showing plain error on direct appeal.  *See United States v. Priddy*, 808 F.3d 676, 682 (6th Cir. 2015).

### b. *Analysis*

Doxey had two predicate offenses rendering him a career offender: a 2001 conviction for delivery of less than 50 grams of cocaine and a 2002 conviction for delivery of less than 50 grams of cocaine. Doxey was seventeen years old when he committed the 2001 offense and was prosecuted as an adult in Michigan state court.

A defendant is classified as a career offender under the Guidelines "if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a).

Doxey does not dispute that he meets the three requirements set forth in U.S.S.G. § 4B1.1(a). That is, he does not dispute that he was over eighteen years old at the time he committed the instant offense, that the instant conviction is a felony, controlled substance offense, and that his 2001 conviction is a controlled substance offense. Rather, Doxey contends that because he was under eighteen years old when he was convicted of the 2001 conviction, its use in classifying him as a career offender violates his equal protection and due process rights. This argument turns on Doxey's position that the same conduct would have been prosecuted as an act of juvenile delinquency in a state other than Michigan, which prosecuted Doxey as an adult at the age of seventeen.

The language of the career offender Guidelines provision provides the answer to this issue. A "prior felony conviction" is "a prior adult federal or state conviction for an offense punishable by death or imprisonment for a term exceeding one year, regardless of whether such offense is specifically designated as a felony and regardless of the actual sentence imposed." U.S.S.G. § 4B1.2 cmt. n.1. A conviction sustained before age eighteen may qualify as a predicate conviction "if it is classified as an adult conviction *under the laws of the jurisdiction in which the defendant was convicted* (e.g., a federal conviction for an offense committed prior to the defendant's eighteenth birthday is an adult conviction if the defendant was expressly proceeded against as an adult)." *Id.* (emphasis added) (parenthesis in original).

Doxey's argument is foreclosed by the language of the career offender Guidelines provision itself. Doxey was tried and convicted as an adult for the offense in question. This fact is dispositive, for a conviction for an offense committed prior to age eighteen is an adult conviction "if it is classified as an adult conviction under the laws of the jurisdiction in which the defendant was convicted." *Id.* Indeed, as far as we can tell, every court to face the issue has rejected the argument Doxey makes here—that a defendant's career offender status violates equal protection guarantees, insofar as the predicate offenses include state convictions obtained before the defendant was eighteen years old. *See United States v. McKissick*, 204 F.3d 1282, 1300 (10th Cir. 2000); *United States v. Fonville*, 5 F.3d 781, 785 (4th Cir. 1993) (Congress need not "prescribe a uniform age at which to consider criminals adults, for federal sentencing purposes, under state law to escape an equal protection challenge."); *see also United States v. Muhammad*, 948 F.2d 1449, 1458-59 (6th Cir. 1991); *United States v. Pinion*, 4 F.3d 941, 945 (11th Cir. 1993); *United States v. Carillo*, 991 F.2d 590, 593 (9th Cir. 1993).

All that matters is that Doxey was convicted in an adult court and received and served an adult sentence. To hold that his conviction should not be considered for purposes of determining criminal history ignores the plain language of the career offender Guidelines provision, not to mention this Court's precedent.

We likewise reject Doxey's *Johnson* claim. Doxey's PSR stated that his conviction for third-degree fleeing and eluding a police officer was a "crime of violence" under the residual clause of the career offender enhancement, U.S.S.G. § 4B1.2(a)(2). In *Johnson*, the Supreme Court held that the identically worded residual clause of the ACCA is void for vagueness. 135 S. Ct. at 2557. *Compare* U.S.S.G. § 4B1.2(a)(2), *with* 18 U.S.C. § 924(e)(2)(B)(ii). We have interpreted both clauses identically, *see United States v. Ford*, 560 F.3d 420, 421 (6th Cir. 2009), and recently held that the residual clause of the Guidelines' career offender enhancement is unconstitutionally vague in light of *Johnson*, *see United States v. Pawlak*, 822 F.3d 902, 907 (6th Cir. 2016) ("Johnson's rationale applies with equal force to the Guidelines' residual clause.").

Notwithstanding our prior holdings, nothing in the sentencing transcript suggests that the district court counted Doxey's fleeing and eluding conviction as a predicate offense. Rather, the district court found that "[a]s far as the career offender status is concerned, [Doxey] has the

requisite prior predicate offenses for treatment under the guidelines as a career offender." (R. 95 at 851.) Only two predicate convictions are needed to qualify as a career offender, and Doxey's two delivery of cocaine convictions qualified as predicates. There is therefore no reason to remand; the district court did not plainly error when it sentenced Doxey as a career offender.

**CONCLUSION**

For the reasons stated above, we **AFFIRM** the district court's judgment.