NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0607n.06

No. 17-1265

**FILED**
Nov 02, 2017
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,      )
       )
   Plaintiff-Appellee,      )
       )
v.      )   ON APPEAL FROM THE UNITED
       )   STATES DISTRICT COURT FOR THE
BIJAN WOODLEY,      )   EASTERN DISTRICT OF MICHIGAN
       )
   Defendant-Appellant.      )
       )
       )

BEFORE:    DAUGHTREY, McKEAGUE, and DONALD, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Based in large part upon inculpatory statements given by defendant Bijan Woodley to law enforcement officers, a jury convicted Woodley of carjacking and of use of a firearm during and in relation to a crime of violence. The district court imposed consecutive prison sentences of 24 months and 84 months, to be followed by three years of supervised release. On appeal, Woodley now contends that his confessions—and the evidence that was uncovered as a result of those confessions—were obtained in violation of his right to counsel guaranteed by the Sixth Amendment to the United States Constitution. He also argues that the government's failure to bring him before a magistrate judge "without unnecessary delay" should have led the district court to suppress incriminating evidence obtained prior to that court appearance. Supreme Court and circuit precedent lead us to conclude that

Woodley's allegations of error are without merit. We thus affirm the judgment of the district

court.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 8, 2015, a federal grand jury indicted Woodley for a December 30, 2014,

carjacking and for using a firearm during and in relation to that crime of violence. Four days

later, on January 12, Detroit Police Department detective Moises Jimenez, armed with an arrest

warrant, found Woodley in a residence, cuffed him, informed him that he was being arrested for

a carjacking incident, and arranged for the defendant to be transported to police headquarters.

Woodley arrived at the headquarters at approximately 8:00 p.m. on January 12, and at

8:13 p.m., he initialed and signed a notification-of-rights form that, in pertinent part, provided:

> I understand that:
> 1. I have a right to remain silent and that I do not have to answer any questions put to me or make any statements.
> 2. Any statement I make or anything I say will be used against me in a Court of Law.
> 3. I have the right to have an attorney (lawyer) present before and during the time I answer any questions or make any statement.
> 4. If I cannot afford an attorney (lawyer), one will be appointed for me without cost by the Court prior to any questioning.
> 5. I can decide at any time to exercise my rights and not answer any questions or make any statement.
> I understand that these are my rights under the Law. I have not been threatened or promised anything, and I now desire and agree to answer any questions put to me or to make a statement.

At that time, however, neither Detroit Police Department Detective Richard Houser nor Officer

Lori Dillon informed Woodley that he already had been indicted for the carjacking for which he

was arrested. In fact, as he was signing the waiver-of-rights form, Woodley asked, "What am I

here for?" and later, when Houser stated, "You know why you're here," Woodley replied, "I

really don't."

Over the next two hours, the officers were recorded[1] questioning Woodley about his acquaintances and asking him to identify individuals in various photographs, including a photograph of Kanee Goode, an individual indicted with Woodley for the December 30 carjacking. Then, at 10:05 p.m., the interrogators showed Woodley a surveillance video taken in the parking lot of Lou's Coney Island, a 24-hour restaurant where the carjacking under investigation had occurred, and asked Woodley whether he was one of the people shown in the video. Three times, Woodley denied that he was involved in the carjacking, the last time after Dillon had informed him, "You've been indicted for this carjacking . . . . [Y]ou're going to go through the federal system." For approximately 30 more minutes, Woodley continued to deny any participation in the carjacking, and at 10:50 p.m., Houser offered Woodley the opportunity to take a cigarette break.

Curiously, when the interrogation resumed ten or so minutes later, only one of the two cameras recording the questioning was operational, thus offering a video, but not an audio, record of the last 51 minutes of the interrogation. However, both Dillon and arresting officer Jimenez, who was present during the questioning after the cigarette break, offered written summaries of what Woodley purportedly said during those 51 minutes—approximately three to four hours after his arrest. According to Dillon:

> WOODLEY confessed to being involved in a carjacking that took place on December 30, 2014 at 19100 Mound, Detroit, Michigan. WOODLEY denied knowing the other two subjects who assisted WOODLEY during the carjacking. WOODLEY stated that he was with two other unknown black males who provided the weapons that were used during the robbery.

---

[1] The recording equipment at the police headquarters was activated automatically "once you open the door and turn the lights on" in the interrogation room.

Jimenez's report stated:

> ON 01/12/2015 AT APPROXIMATELY 8:10 PM, POLICE OFFICER LORI DILLION [sic] ASSIGNED TO THE V[IOLENT] C[RIMES] T[ASK] F[ORCE] ALONG WITH DETECTIVE RICHARD HOUSER ASSIGNED TO DETROIT HOMICIDE INTERVIEWED SUBJECT: BIJUAN [sic] WOODLEY WHO WAS READ HIS CONSTITUTIONAL RIGHTS WHICH HE WAIVED AND PROVIDED ACCOUNTS OF HIS PARTICIPATION OF A CAR-JACKING OF A WHITE IN COLOR CADILLAC AT A CONEY ISLAND.
>
> SUBJECT: BIJUAN [sic] WOODLEY WAS TAKEN OUTSIDE BY WRITER FOR A CIGARETTE BREAK. SUBJECT WAS THEN BROUGHT BACK TO THE INTERVIEW ROOM WHERE WRITER BEGAN QUESTIONING HIS INVOLVEMENT IN THE CAR-JACKING. SUBJECT THEN STATE [sic] THAT HE WAS PICKED UP IN A TRUCK AND THAT A LONG RIFLE WAS ALREADY IN THERE. SUBJECT CONTINUE [sic] TO SAY THAT HE KNEW THE VICTIM AND THAT HE HAD FIRST SEEN HIM AT THE GAS STATION ACROSS THE STREET FROM THE CONEY ISLAND. SUBJECT THEN STATED THAT THEY FOLLOWED THE VICTIM TO THE CONEY ISLAND, WHERE HE, THE SUBJECT[,] WAS ARMED WITH A RIFLE AND DEMANDED THE VICTIMS' [sic] ITEMS AND VEHICLE. (ROBBING THE VICTIM ITEMS: JEWELRY AND WALLET) SUBJECT THEN STATED THAT THEY LEFT THE AREA, TAKING THE VICTIMS [sic] BELONGINGS TO INCLUDE THE WHITE IN COLOR CHRYSLER 300 AND WAS DROPPED OFF. SUBJECT REFUSED TO GIVE INFORMATION ON THE OTHER INDIVIDUALS HE WAS PARTICIPATING WITH AND/OR ANY INFORMATION OF THEIR IDENTITY.
>
> SUBJECT INTERVIEW CONTINUED BY P.O. DILLION [sic] AND DETECTIVE HOUSER.
>
> SUBJECT WAS GIVEN AMPLE OPPORTUNITY TO TAKE A BREAK, GO TO THE BATHROOM AND WAS NOT INTOXICATED NOR ON ANY DRUGS AT THE TIME OF THE INTERVIEW.
>
> WRITER COMPLETED THIS REPORT DUE TO THE AUDIO/VIDEO EQUIPMENT MALFUNCTION. (NOTIFIED BY P.O. DILLION [sic] OF THE MALFUNCTION)

The next morning, January 13, 2015, Woodley was taken to FBI headquarters, was advised again of his *Miranda* rights, and, after waiving those rights a second time, was interviewed by FBI Special Agent Michael FitzGerald. According to FitzGerald, Woodley told him that he (Woodley) had been at a bar with his girlfriend during the early morning hours of

December 30, 2014. When his girlfriend left to meet another individual, Woodley obtained a ride in a Dodge Durango from an individual Woodley claimed he did not know. The two occupants of the Durango and Woodley eventually drove to the parking lot of the Coney Island restaurant where Woodley grabbed an assault rifle from the backseat of the Durango, approached the passenger side of a white Chrysler 300, and tapped on the window of the Chrysler with his weapon so that the driver of the Chrysler would lower the passenger window. At that time, Woodley and another individual from the Durango forced the Chrysler's driver from the vehicle, got into the Chrysler, and drove it away. Later, Woodley met up with an individual named D.J., exchanged the Chrysler for D.J.'s BMW, and drove the BMW to Woodley's girlfriend's home.

By the time the FBI concluded its interrogation of Woodley, it was too late in the day to have the defendant arraigned. As a result, Woodley did not appear before a magistrate judge until January 14, 2015, two days after his arrest and six days after the return of the initial indictment against him.

Eventually, the grand jury returned a first superseding indictment against Woodley. In that subsequent charging instrument, the government re-alleged the two crimes with which Woodley originally had been charged, but also charged the defendant with two additional carjackings, each of which involved his use of a firearm.

Prior to trial, Woodley filed numerous motions, including a "Motion to Suppress Statements and Evidence Taken in Violation of Defendant's Sixth Amendment Right to Counsel." The district court denied that motion, and Woodley proceeded to trial where the government introduced into evidence the defendant's confessions, as well as cellphone-tracking information that placed Woodley at the scene of the December 30 carjacking at the time of the crime.

The government eventually moved to dismiss all counts of the first superseding indictment against Woodley, except for the two counts relating to the December 30 carjacking. Those motions were granted, and after the jury convicted Woodley of the two remaining counts, the district court sentenced Woodley to a below-Guidelines sentence of 24 months on the carjacking count, to be served consecutively with an 84-month sentence for the use of a firearm during and in relation to a crime of violence.

Woodley now appeals, raising two issues for our consideration. First, he contends that he could not have knowingly waived his Sixth Amendment right to counsel without first being informed that he already had been indicted for the carjacking crime. Thus, he argues that the district court erred in denying his motion to suppress any evidence that flowed from his initial interrogation. Second, Woodley argues for the first time on appeal that the government's failure to bring him before a magistrate judge "without unnecessary delay" rendered inadmissible any incriminating statements or evidence elicited from him during his later confession to the FBI agent.

## DISCUSSION

### Waiver of Sixth Amendment Right to Counsel

When ruling upon the propriety of a district court's denial of a motion to suppress evidence, we review factual determinations for clear error and legal conclusions *de novo*. *United States v. Pacheco*, 841 F.3d 384, 389 (6th Cir. 2016). Moreover, we "must consider the evidence in the light most favorable to the government." *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (*en banc*).

In pertinent part, the Sixth Amendment to the Constitution of the United States provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of

Counsel for his defence." U.S. Const., amend. VI. "[A] person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him"—"whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 688–89 (1972). Thus, "once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." *Brewer v. Williams*, 430 U.S. 387, 401 (1977) (citing *Massiah v. United States*, 377 U.S. 201(1964)) (footnote omitted).

Here, Woodley was indicted for the December 30, 2014, carjacking on January 8, 2015. As of that date, therefore, his Sixth Amendment right to the assistance of counsel attached. However, there is no dispute that the questioning of Woodley on January 12 and 13, 2015, occurred without counsel being present to advise Woodley. Thus, as was the Supreme Court in *Patterson v. Illinois*, 487 U.S. 285 (1988), "we are called on to determine whether the interrogation of [the defendant] after his indictment violated his Sixth Amendment right to counsel." *Id.* at 287.

In addressing this inquiry, we recognize that the Supreme Court long has held that a criminal defendant may waive his or her Sixth Amendment right to counsel, even at a critical stage of the proceedings. *Johnson v. Zerbst*, 304 U.S. 458, 464–65 (1938). Even so, reviewing courts must be vigilant to ensure that any such waiver "reflects 'an intentional relinquishment or abandonment of a known right or privilege.'" *Patterson*, 487 U.S. at 292 (quoting *Johnson*, 304 U.S. at 464). Consequently, the key inquiry becomes: "Was the accused, who waived his Sixth Amendment rights during postindictment questioning, made sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel?" *Id.* at 292–93.

Answering that question, the Supreme Court in *Patterson* held:

> As a general matter, then, an accused who is admonished with the warnings prescribed by this Court in *Miranda [v. Arizona*, 384 U.S. 436, 479 (1966)], has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.

*Id.* at 296 (footnote omitted). Specifically, the Court noted that the *Miranda* admonitions that a defendant "had a right to consult with an attorney, to have a lawyer present while he was questioned, and even to have a lawyer appointed for him if he could not afford to retain one on his own" were sufficient to make a defendant aware of the right to have counsel present during any postindictment questioning. *Id.* at 293. The Court also recognized that *Miranda* warnings would serve to make an individual aware of the consequences of a decision to waive Sixth Amendment rights by letting "petitioner know what a lawyer could 'do for him' during the postindictment questioning: namely, advise petitioner to refrain from making any such statements." *Id.* at 293–94 (footnote omitted).

Woodley maintains, however, that his situation is different from that of the petitioner in *Patterson* because Woodley was unaware at the time of his waiver of rights and questioning that he was under federal indictment. In support of that position, Woodley directs us to the decision of the Second Circuit in the pre-*Patterson* case of *Carvey v. LeFevre*, 611 F.2d 19 (2d Cir. 1979). In *Carvey*, the Second Circuit ruled that "[w]ithout knowledge of a pending indictment, the accused cannot appreciate the gravity of his legal position or the urgency of his need for a lawyer's assistance." *Id.* at 22. Indeed, according to the court, "[h]ad he known that he was not merely suspected of the crime but actually under indictment, Carvey might well have been more circumspect in his replies and more insistent on his immediate right to counsel." *Id.*

Although there is some logical and emotional appeal to Woodley's argument, we reject it for two reasons. First, even the Court of Appeals for the Second Circuit has disavowed the holding in *Carvey* in light of the Supreme Court's pronouncement in *Patterson*. *See United States v. Charria*, 919 F.2d 842, 847 (2d Cir. 1990). Second, the danger envisioned in *Carvey*— answering questions without knowledge that the detainee was "not merely suspected of the crime but actually under indictment"—is not present in this case because Woodley did not offer any statements implicating himself in the carjacking until one hour *after* Dillon informed him that an indictment had been returned against him.

In *Patterson*, the Supreme Court opted for "a more pragmatic approach to the waiver question—asking what purposes a lawyer can serve at the particular stage of the proceedings in question, and what assistance he could provide to an accused at that stage—to determine the scope of the Sixth Amendment right to counsel." *Patterson*, 487 U.S. at 298. Concluding that there is no "substantial difference between the usefulness of a lawyer to a suspect during custodial interrogation, and his value to an accused at postindictment questioning," the Court determined "that whatever warnings suffice for *Miranda*'s purposes will also be sufficient in the context of postindictment questioning." *Id.* at 298–99.

Because we are bound by settled Supreme Court precedent, and because nothing in the record before us indicates that Woodley's waiver of rights was not knowing and voluntary, we conclude that the postindictment questioning of Woodley did not violate his Sixth Amendment right to counsel. Woodley's first issue on appeal is without merit.

**Alleged Violation of Rule 5 of the Federal Rules of Criminal Procedure**

For the first time on appeal, Woodley argues that the district court also erred in failing to suppress statements and evidence related to the FBI's interrogation of him on January 13, 2015.

According to the defendant, that evidence must be suppressed because he was not brought before a magistrate judge "without unnecessary delay," as required by Federal Rule of Criminal Procedure 5(a)(1)(A).

Because Woodley failed to file a motion to suppress this evidence on this ground in the district court, we review his allegation for plain error. *See, e.g.*, *United States v. Doxey*, 833 F.3d 692, 702 (6th Cir. 2016) (Keith, *Clay*, White), *cert. denied*, 137 S. Ct. 2204 (2017). Under the plain-error standard, Woodley must establish: (1) error; (2) that is "plain"; and (3) that affects substantial rights of the defendant. *See United States v. Olano*, 507 U.S. 725, 732–34 (1993). Even if Woodley can establish each of those elements, we will correct a plain, forfeited error only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 736 (citation omitted).

As explained by the Supreme Court in *Corley v. United States*, 556 U.S. 303, 306 (2009), "[t]he common law obliged an arresting officer to bring his prisoner before a magistrate as soon as he reasonably could." That mandate now is found in Federal Rule of Criminal Procedure 5(a)(1)(A), which states explicitly that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise."

In an effort to add "teeth" to the requirement, the Supreme Court, in the exercise of its supervisory authority, held that defendants' confessions would be deemed inadmissible at trial "when obtained during unreasonable presentment delay." *Corley*, 556 U.S. at 307 (discussing the holding in *McNabb v. United States*, 318 U.S. 332 (1943)). Then, in *Mallory v. United States*, 354 U.S. 449, 455 (1957), the Court held a defendant's confession inadmissible when it was given seven hours after arrest but prior to presentment before a magistrate judge, even

though the confession took place "within the vicinity of numerous committing magistrates." The principle that "generally rendered inadmissible confessions made during periods of detention that violated the prompt presentment requirement of Rule 5(a)" thus came to be known as the *McNabb-Mallory* rule. *United States v. Alvarez-Sanchez*, 511 U.S. 350, 354 (1994).

In passing 18 U.S.C. § 3501, Congress "modified *McNabb-Mallory* without supplanting it." *Corley*, 556 U.S. at 322. That statutory provision creates a six-hour "safe harbor," deeming any delay of six hours or less between arrest and presentment reasonable enough that any confession given within that time frame will be admissible if "made voluntarily and if the weight to be given the confession is left to the jury." 18 U.S.C. § 3501(c). "If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed." *Corley*, 556 U.S. at 322.

Woodley's confession to FBI Agent FitzGerald on January 13 was made more than 15 hours after the defendant's arrest, but still prior to the time he was taken before a magistrate judge. Woodley thus argues that adherence to the *McNabb-Mallory* rule should have led the district court to suppress any incriminating statements and evidence flowing from that second admission of guilt. However, Sixth Circuit precedent holds that "waiver of one's *Miranda* rights also constitutes a waiver under *McNabb-Mallory*," meaning that "[a] valid *Miranda* waiver also waives the prompt judicial warning of one's constitutional rights." *United States v. Barlow*, 693 F.2d 954, 959 (6th Cir. 1982). Thus, the district court's admission of Woodley's pre-arraignment FBI confession cannot be considered plain error despite the government's failure to bring the defendant before a magistrate judge within six hours of his arrest.

Furthermore, any error, plain or otherwise, in the admission of Woodley's second confession, or of evidence obtained as a result of that confession, must be considered harmless beyond a reasonable doubt. In his first, admissible confession, Woodley conceded that he was complicit in the carjacking for which he was indicted. Moreover, at trial, the two victims of the carjacking crime identified Woodley as the individual who held the assault rifle and forced them from the Chrysler and onto the ground. There is, therefore, no merit to Woodley's challenge to the admissibility of his second confession.

## CONCLUSION

The Supreme Court's decision in *Patterson* makes clear that the knowing and voluntary waiver of a defendant's *Miranda* rights is sufficient to establish waiver of his right to counsel during postindictment questioning. Furthermore, Sixth Circuit precedent establishes that Woodley's second waiver of his *Miranda* rights prior to his questioning by the FBI also constituted a waiver under *McNabb-Mallory*, even though that questioning occurred more than six hours after the defendant's arrest. In the absence of any error in the admission of Woodley's confessions at trial, we AFFIRM the judgment of the district court.