*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0192p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　　*Plaintiff-Appellee,*

　　*v.*

RICKEY DONNEL SMITH,

　　　　　　*Defendant-Appellant.*

No. 07-1375

>

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 05-50062-001—Paul V. Gadola, District Judge.

Argued: April 28, 2008

Decided and Filed: May 22, 2008

Before: BATCHELDER and SUTTON, Circuit Judges; BARZILAY, Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:** David A. Koelzer, FEDERAL DEFENDER'S OFFICE, Flint, Michigan, for Appellant. Robert W. Haviland, ASSISTANT UNITED STATES ATTORNEY, Flint, Michigan, for Appellee. **ON BRIEF:** David A. Koelzer, FEDERAL DEFENDER'S OFFICE, Flint, Michigan, for Appellant. Robert W. Haviland, ASSISTANT UNITED STATES ATTORNEY, Flint, Michigan, for Appellee.

_____

**OPINION**

_____

SUTTON, Circuit Judge. Rickey Smith contends that the district court should have suppressed evidence that officers discovered in his residence while he was serving the last years of a 15-to-30-year sentence as a prisoner in a community residential home, which is to say he was living in a private home while connected to an electronic-monitoring device that ensured he never left the walls of the home without permission. Because the search was reasonable in view of Smith's continuing prisoner status and in view of his knowledge that officers could search his living quarters as freely as they could search his prison cell and because the exclusionary rule does not apply to knock-and-announce violations, we affirm.

_____

[*]The Honorable Judith M. Barzilay, Judge of the United States Court of International Trade, sitting by designation.

I.

In January 1990, a jury convicted Rickey Smith of stealing a car, and, because this was Smith's fourth felony, the court sentenced him to 15 to 30 years' imprisonment as an "habitual offender." JA 56. Fourteen years later, in February 2004, the Michigan Department of Corrections transferred Smith to its Community Residential Program and permitted him to live in a "community residential home." *See* Mich. Dep't of Corr. Policy Directive 06.03.102 (Oct. 23, 1989). This arrangement permitted Smith to live in his sister's home, but it required him to remain there "on tether," JA 90—meaning that Smith would have to remain at his sister's home (unless he obtained permission to leave) and that the State would ensure he did so by tracking him through a transmitter on his ankle and a monitoring device connected to a phone jack in the home.

On July 21, 2004, members of the Department of Corrections responded to a tip that Smith had guns and drugs in the home. After forcibly entering the home, the officers searched the basement (where they believed Smith was staying) and discovered two loaded guns under a mattress in the corner of the room.

Smith pleaded guilty to one felon-in-possession-of-a-firearm charge, *see* 18 U.S.C. § 922(g)(1), while reserving his right to challenge the court's denial of his motion to suppress.

II.

A.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The question here is one of reasonableness, as the warrant and probable cause requirements generally do not apply to searches of parolees, probationers or their residences. *See Samson v. California*, 547 U.S. 843, 857 (2006) (permitting suspicionless searches of parolees); *United States v. Knights*, 534 U.S. 112, 118, 121 (2001) (upholding a warrantless search of a probationer's apartment based on reasonable suspicion and a probation condition requiring him to submit to a search at any time). That means we must consider "the degree to which [the search] intrudes upon an individual's privacy" as well as "the degree to which it is needed for the promotion of legitimate governmental interests." *Samson*, 547 U.S. at 848 (internal quotation marks omitted); *see also Virginia v. Moore*, 128 S. Ct. 1598, 1604 (2008).

One factor central to this balancing inquiry is an individual's status on the "privacy continuum." *Wilson v. Collins*, 517 F.3d 421, 425 n.2 (6th Cir. 2007) (internal quotation marks omitted); *see also Samson*, 547 U.S. at 850. At one end of the continuum are free citizens, who enjoy "absolute liberty." *Knights*, 534 U.S. at 119 (internal quotation marks omitted); *see also Wilson*, 517 F.3d at 425 n.2. Probationers have fewer expectations of privacy than free citizens, *see Knights*, 534 U.S. at 119, and parolees have still "fewer expectations of privacy than probationers," *Samson*, 547 U.S. at 850. At the other end of the spectrum are inmates, who have no legitimate expectation of privacy from searches of their prison cells. *See Hudson v. Palmer*, 468 U.S. 517, 525–26 (1984).

In assessing Smith's situation, *Samson* provides considerable guidance. There, an officer conducted a suspicionless search of a parolee walking down the street. 547 U.S. at 846–47. A condition of Samson's parole order required him "to be subject to search or seizure . . . at any time of the day or night, with or without a search warrant and with or without cause." *Id.* at 846 (internal quotation marks omitted). After balancing Samson's privacy interests against the State's law-and-order interests, the Court held that the search was reasonable because (1) Samson's status as a

parolee, together with his parole-search condition, deprived him of "an expectation of privacy that society would recognize as legitimate" and (2) the State has an "overwhelming interest in supervising parolees." *Id.* at 850, 852–53 (internal quotation marks omitted).

Smith had fewer expectations of privacy than Samson. Smith was treated as a "prisoner" living in a community residential home, Mich. Comp. Laws § 791.265a(1)(c), (9)(b); Mich. Admin. Code r. 791.4401(2)(h), not as a parolee. And while the State permitted Samson to move freely and travel within 50 miles of his home without requesting permission and placed no monitoring device on him, 547 U.S. at 851, the State physically connected Smith to a device that monitored his every movement and made him obtain approval before leaving the walls of his sister's home—even if he wished only to go into the yard or onto the porch, *see* Mich. Admin. Code r. 791.4425(3); Mich. Dep't of Corr. Policy Directive 06.03.102. If "[t]he extent and reach of [Samson's] conditions clearly demonstrate[d] that [he had] severely diminished expectations of privacy by virtue of [his] status alone," *Samson*, 547 U.S. at 852, then the same assuredly was true for Smith.

Nor should any of this have come as a surprise to Smith. The officers' uncontradicted testimony shows that they informed Smith that they had as much freedom to enter his home as they did to enter his prison cell. At an orientation, Smith viewed a video explaining "that the Department has the authority to go to the home, make home calls if need[ed] to search the premises, his area of control where he . . . sleeps . . . , *just as if he were still in the facility*," JA 94 (emphasis added), and officials explained to Smith that "his home was his prison," JA 93; *see also* Mich. Admin. Code r. 791.4425(3). No one disputes these facts, and no one argues that an inmate has any legitimate expectation of privacy from unannounced searches of his prison cell. *See Palmer*, 468 U.S. at 526 (holding that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell"). Smith thus was "aware" that his home was subject to search at any time, with or without suspicion. *Samson*, 547 U.S. at 852. Accounting for all of these circumstances—the tether, the need for authorization to leave the walls of his home and the officers' authority to search his home at any time—Smith had little, if indeed any, reasonable expectation of privacy in being free from a suspicionless search of his residence.

The State's interest in permitting such searches is at least as great as it was in *Samson*. As in *Samson*, "a State has an overwhelming interest in supervising" community-resident prisoners because they "are more likely to commit future criminal offenses." *Id.* at 853 (internal quotation marks omitted). As in *Samson*, the State's interests in reducing recidivism and promoting rehabilitation "warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Id.* And as in *Samson*, a State's ability to release individuals into a Community Residential Program depends on its ability to supervise the inmates effectively, enforce the conditions of confinement and protect the public from recidivist offenders. *See id.* at 854.

Nor do a trio of cases—*United States v. Knights*, 534 U.S. 112, 121 (2001), *Griffin v. Wisconsin*, 483 U.S. 868, 875–76 (1987), and *United States v. Henry*, 429 F.3d 603, 608–09 (6th Cir. 2005)—establish that the reasonable-suspicion standard should apply instead. Not only did *Knights*, *Griffin* and *Henry* all involve probationers, as opposed to parolees or community-resident prisoners, but all of these cases were decided before *Samson*. *Samson* addressed (at least in the context of a parolee search) a question it had reserved in *Knights*: "whether the search would have been reasonable under the Fourth Amendment had it been solely predicated" on the inmate's condition of release, not on reasonable suspicion. *Samson*, 547 U.S. at 850. Because "parolees have fewer expectations of privacy than probationers," the Court held that a suspicionless search of a parolee was reasonable. *Id.* at 850, 857. "Imposing a reasonable suspicion requirement," the Court added, "would give parolees greater opportunity to anticipate searches and conceal criminality." *Id.* at 854. This reasoning applies with at least as much force to a community-resident prisoner

released with an electronic-monitoring device attached to him, prohibited from leaving the home without permission and told that he has no more privacy in the home than he had in his jail cell.

*Samson*, true enough, involved the search of a parolee's person, not his residence.  But the Court's reasonableness inquiry focused on the parolee's status and the freedom-to-search condition attached to his parole, not on a person-versus-premises distinction.  Smith's status gave him no greater  expectation of privacy than Samson, and the rules governing Smith's confinement allowed officers to search the premises and the areas within Smith's control "just as if he were still in the facility." JA 94.  *Samson* thus applies.  "Any other rule would diminish the protection to society given by the search condition [that] permit[s] search at any time." *United States v. Lopez*, 474 F.3d 1208, 1213 (9th Cir. 2007) (applying *Samson* to the search of a parolee's residence).

Smith also tries to distinguish *Samson* on the ground that his search condition was communicated through a video and orientation discussions, not through a written parole agreement.  That fact neither distinguishes *Samson* nor diminishes the clarity of the condition.  There was no written search condition for parole because the Department of Corrections did not place Smith on parole.  Individuals released to a community residential home, like prisoners in a correctional facility, are bound by the Department of Corrections' rules, which may or may not include a written agreement.  *Compare* Mich. Admin. Code r. 791.4425(3) ("Each prisoner who is classified to community status shall be subject to general and special conditions that are established by the head of the office of residential and electronic programs."), *with id.* r. 791.7730(4) ("A paroled prisoner shall comply with the conditions of parole contained in the parole order and with all subsequent conditions approved by the chairperson of the parole board.").  *Samson* expressly declined, moreover, to rest its holding solely on a consent rationale, 547 U.S. at 852 n.3, explaining that the written condition was but one "salient" factor in the "totality of the circumstances pertaining to [the parolee's] status," *id.* at 852 (internal quotation marks omitted).  *See Wilson*, 517 F.3d at 426–27 (refusing to confine *Samson* to situations in which a suspicionless search is expressly authorized by a parole agreement).  The district court correctly denied Smith's suppression motion.

B.

Smith independently argues that the officers' unannounced entry into the residence failed to comply with the knock-and-announce rule "in violation of the Fourth Amendment and 18 U.S.C. § 3109" and contends that the evidence should be suppressed on this ground alone.  JA 12; *see also Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).  We disagree.

1.

Like the district court, we find it unnecessary to resolve the witnesses' conflicting testimony to determine whether there was a knock-and-announce violation.  And we agree with the district court that, regardless of whether there was a violation, the Supreme Court has held that the exclusionary rule does not apply in this setting.  *Hudson v. Michigan*, 547 U.S. 586 (2006), concluded that, if officers violate the knock-and-announce rule in the course of executing a search warrant, the victim may file a § 1983 action for money damages but may not suppress the evidence because that remedy does not further the interests served by the knock-and-announce rule, *see id.* at 593, 597, and because at any rate the "deterrence benefits" of the exclusionary rule do not "outweigh its substantial social costs," *id.* at 594 (internal quotation marks omitted).

Nor, contrary to Smith's suggestion, does *Hudson* apply only when the officers have a search warrant.  The explanations given by *Hudson* are not confined to situations in which the officers violate the knock-and-announce rule after obtaining a warrant as opposed to situations, like this one, where they allegedly violate the rule when they need not obtain a warrant.  In both settings, the interests served by the knock-and-announce rule—protection of life and limb, protection of property

and the opportunity to collect oneself before answering the door—"have nothing to do with the seizure of the evidence," *id.*, and nothing to do with whether the Fourth Amendment required the officers to obtain a warrant. There is nothing about the presence of a warrant that increases the value of deterring knock-and-announce violations, which the Court tells us "is not worth a lot," *id.* at 596, or that mitigates the "substantial social costs" of suppressing the evidence, *id.* at 594 (internal quotation marks omitted).

Smith's rule also inverts the relative vices and virtues of the two situations. Why should Smith have *more to gain* from a knock-and-announce violation when the Fourth Amendment does not even require the officer to obtain a warrant to search his home because he has little-to-no expectation of privacy? Or what about a probationer who expressly consents to future searches? *See Knights*, 534 U.S. at 114. If there is a potential distinction here, it would be that when the Fourth Amendment *requires* the police to have a warrant before they search a home, the victims of *that* knock-and-announce violation ought to benefit from the exclusionary rule more than individuals for whom the Fourth Amendment imposes no such requirement—a distinction quite the opposite from the one Smith proposes. Yet because *Hudson* already says that the exclusionary rule does not apply to the individuals with the greatest and most legitimate expectations of privacy, it necessarily does not apply to those with the least.

2.

As for Smith's reliance on the federal knock-and-announce statute, 18 U.S.C. § 3109, there is not much to say. It "regulates only federal officers . . . and has no application when state officers, acting totally without federal involvement, seize evidence that is later offered in a federal prosecution." *United States v. Gatewood*, 60 F.3d 248, 249 (6th Cir. 1995) (internal quotation marks omitted); *see also United States v. Ferguson*, 252 F. App'x 714, 719 (6th Cir. Oct. 26, 2007). Because both sides agree that only state officers conducted the search, the statute does not apply.

III.

For these reasons, we affirm.