**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 19a0233n.06

Case No. 17-5249

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| | | **FILED** |
| | | May 01, 2019 |
| UNITED STATES OF AMERICA, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| CHARLES MASSENGILL, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: SILER, SUTTON, and WHITE, Circuit Judges.

SILER, Circuit Judge. A Tennessee jury found Charles Massengill guilty of five charges: two counts of possession with intent to distribute controlled substances, conspiracy to possess controlled substances with intent to distribute, possession of a firearm in furtherance of a drug trafficking crime, and felon in possession of a firearm. Massengill appeals his conviction and sentence, challenging: (1) the denial of his motion to suppress; (2) the sufficiency of the evidence relating to his conspiracy conviction; (3) the denial of his motion for a mistrial; (4) his obstruction-of-justice sentencing enhancement; and (5) the testimony of the investigating detective.

We AFFIRM.

I.

Massengill was convicted in Georgia of armed robbery and aggravated assault, imprisoned, and released in 2010.  [R. 39, Page ID 259-61.]  He requested his parole be transferred from Georgia to Tennessee.  [*Id.* at 252, 259, 261-62.]  One component of a transfer request is the completion of a parole certificate, a standard form to be signed by the parolee.  [*Id.* at 258.]  Massengill signed his parole certificate in 2012, which included his consent to "a search without a warrant of his person, vehicle, property or place of residence by any probation or parole officer or law enforcement officer at any time without reasonable suspicion."  [*Id.* at 260, 264-65.]

In 2014, the Bradley County Sheriff's Department received information from an informant who had smoked methamphetamine with Massengill that Massengill was distributing methamphetamine from his residence in Cleveland, Tennessee, and was known to possess a gun.  [R. 39, PageID 276-77, 298-300; R. 171, PageID 2057-58.]  After presenting Massengill with a copy of the parole certificate, detectives searched his residence and found more than a kilogram each of methamphetamine and marijuana, a handgun, over $100,000 in cash, and other drug-related materials.  [R. 39, PageID 279-81, 283-86, 320, 324-25, 333-34, 343; R. 171, PageID 2072-99.]  Detectives advised Massengill of his *Miranda* rights, and he confirmed his understanding of those rights.  [R. 39, PageID 336; R. 171, PageID 2100.]  A detective then questioned Massengill, who stated that he had traveled to Atlanta three times to purchase methamphetamine.  [R. 39, PageID 336-37; R. 171, PageID 2100-01.]

Massengill was indicted on five charges: two counts of possession with intent to distribute controlled substances, conspiracy to possess controlled substances with intent to distribute, possession of a firearm in furtherance of drug trafficking, and being a felon in possession of a

firearm. [R. 1, PageID 1-2; R. 47, PageID 407-09.] He moved to suppress the evidence recovered during the search and his statement following the search. [R. 16, PageID 31-32.]

After an evidentiary hearing, the magistrate judge recommended denying the motion. [R. 35, PageID 199-221.] Relying on *United States v. Payne*, 588 F. App'x 427 (6th Cir. 2014), she found the parolee search reasonable and Massengill's statements admissible. [*Id.* at PageID 208-21.] The district court adopted the magistrate judge's recitation of the facts, overruled Massengill's objections, and denied the motion to suppress. [R. 38, PageID 237-41.]

Prior to trial, Massengill moved to exclude evidence regarding the nature of his prior convictions, his status as a parolee, and any information received from the confidential informant. [R. 57, PageID 475-76; R. 58, PageID 477-79; R.113, PageID 790-92.] During the final pretrial conference, the government stated that the informant would not testify and that it did not intend to offer any evidence from the informant or about Massengill's parole during its case-in-chief. [R. 174, PageID 2432-46.] Massengill agreed to stipulate that he had a prior felony conviction. [*Id.* at PageID 2433-34; R. 172, PageID 2272-73.]

During direct examination by the United States, Detective Chad Ownby twice provided nonresponsive answers that resulted in testimony about information the sheriff's office had received from the informant and Massengill's parolee status—the issues which the government had agreed not to elicit testimony about during its case-in-chief. [R. 171, PageID 2058, 2060.] In a sidebar shortly following the second nonresponsive answer, the defense objected and moved for a mistrial. [*Id.* at 2060-66.] The district court gave a curative instruction regarding the nonresponsive answers, reserved ruling on the motion for mistrial, and warned Ownby outside the jury's hearing "not to repeat things . . . that you heard from the confidential informant. . . . [T]estify about evidence that you perceived." [*Id.* at 2066-71.] The district court ultimately denied the

motion for a mistrial after reviewing Ownby's testimony and noting the defense's failure to contemporaneously object and the curative instruction it had issued. [R. 172, PageID 2373-78.]

The prosecution introduced two recorded calls that Massengill made from jail to Shannon Hughes the day after his arrest. [R. 172, PageID 2188, 2238-43, 2263-65, 2269.] During the calls, Massengill and Hughes discussed drugs which were not discovered during the search and a hiding place that Massengill asked Hughes to empty. [*Id.* at PageID 2239-42; Ex. 40-K1, at 5:30-6:20, 12:09-13:02; Ex. 40-K2, at 9:17-9:41.] Hughes told Massengill that it would "be taken care of[,]" which Massengill said would "help get some money on my books, too." [Ex. 40-K1, at 5:30-6:20.] Massengill also told Hughes that the police wanted to "get in" his phone, and Hughes told him she had "hacked" the cell phone account online, "changed the password," and reported the phone stolen—consistent with Massengill's refusal to allow the detectives to search his phone, saying they would have to "work for" its contents. [R. 172, PageID 2239-42, 2280; Ex. 40-K2, at 1:30-2:05.] The two also discussed hiding Massengill's vehicle and transferring the title to his daughter so that the government could not "snatch it." [Ex. 40-K2, at 6:20-7:10.]

Detective Marshall Hicks testified that Massengill's cell phone revealed text messages consistent with drug trafficking. [R. 172, PageID 2232-38, 2354-59.] These included messages received from individuals asking him to "fix [them] a sack," saying they "need[ed]" a "half O" or a "teenager," or asking about prices or the availability of "green" or "Xanaxes [sic]." [*Id.* at 2355-59.]

Tennessee Bureau of Investigation Special Agent Mark Delaney testified as an expert witness, explaining that the terms "sacks" and "teenagers" were slang terms specifically associated with methamphetamine distribution—for example, he testified that a "teenager" refers to a sixteenth of an ounce of methamphetamine—and that "green" ordinarily referred to marijuana.

[*Id.* at 2311-67.] He additionally stated that the price quoted by Massengill in the text messages—$700 for half an ounce—was consistent with his knowledge about the street price of methamphetamine in east Tennessee. [*Id.* at 2358-59.] Delaney also testified that the kilogram of methamphetamine recovered from Massengill's residence represented a distribution quantity, which would then "typically [be] split . . . into probably ounce quantities. . . ." [*Id.* at 2318, 2331.] He further identified Atlanta as a common source city for methamphetamine and explained the distribution purposes for the various paraphernalia found in Massengill's bedroom. [*Id.* at 2318, 2323-24, 2330-34.]

At the close of the government's case-in-chief, Massengill sought a judgment of acquittal under Fed. R. Crim. P. 29 on the conspiracy charge, among others. [*Id.* at 2368-70.] The United States identified three categories of coconspirators: a source in Atlanta, known as "Chuck," the customers who purchased methamphetamine from Massengill, and Hughes, whom Massengill instructed to remove drugs from the hiding place at his residence. [*Id.* at 2370-71.] The district court denied the motion both initially and when it was renewed at the close of all evidence. [*Id.* at 2373; R. 176, PageID 2468-69.] The jury convicted Massengill on all counts. [R. 142, PageID 866-72.]

The probation office's presentence report (PSR) deemed Massengill responsible for both the drugs seized from his residence—1.116 kilograms of methamphetamine and 1.3406 kilograms of marijuana—as well as another 1360.78 grams of a methamphetamine mixture, based on his admitted drug purchases in the months prior to his arrest. [R. 155, PageID 1809-10.] Those quantities resulted in a base offense level of 34.[1] [*Id.* at PageID 1810-11.] The probation office

---

[1] The probation office did not include the converted amount of the money seized from Massengill's residence because the additional quantity would not have affected the guideline range. [R. 155, PageID 1809-10.]

also applied a two-level enhancement for obstruction of justice, based on the calls with Hughes, leading to an adjusted offense level of 36. [*Id.* at 1809, 1811.] With a criminal history category of IV, the resulting sentencing guideline range was 262-327 months' imprisonment for the drug offenses, followed by the mandated consecutive 60-month term for the § 924(c) violation, for an effective guidelines range of 322-387 months' imprisonment. [*Id.* at 1811-13, 1817.]

Massengill objected to the PSR, initially disputing various facts and objecting to the conclusion that a variance was not warranted; he later additionally objected to "all factual allegations" in the PSR and to the obstruction-of-justice enhancement. [R. 150, PageID 1784-86; R. 157, PageID 1828-29.] He further requested a downward variance based on his history and characteristics—specifically his age, then 64—which he argued warranted a sentence no greater than the fifteen-year mandatory minimums. [R. 152, PageID 1788-89; R. 153, PageID 1790-96.]

The district court overruled Massengill's objections and accepted the guidelines calculations in the PSR. [R. 180, PageID 2554-66.] It reviewed the 18 U.S.C. § 3553(a) factors, allowed the defendant to speak, and sentenced him to a below-guidelines total term of 264 months' imprisonment. [R. 166, PageID 2034; R. 170, PageID 2047-48; R. 179, PageID 2541-45.]

II.

A.

Massengill contends that the district court failed to consider the existence of a reasonable suspicion to conduct the parolee search, and that the search was "simply a device to circumvent the search warrant application process."[2] [Appellee Br. 7-8, 12-19.] When reviewing a district

---

[2] Massengill argues that the district court failed to follow the two-factor test established in *United States v. Doxey*, 833 F.3d 692, 703 (6th Cir. 2016) [Appellant Br. 12-14]; as the government points out, however, this argument fails on two fronts. First, this court decided *Doxey* in August 2016, more than a year after the district court's decision in this case. Second, the search condition at issue in *Doxey* was based on a Michigan statute, not, as here, the Tennessee parole certificate

court's decision on a motion to suppress, we review factual conclusions for clear error and conclusions of law de novo. *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010) (citation omitted). Where, as here, the motion was denied, we "must consider the evidence in the light most favorable to the government." *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc) (citation omitted).

There are "exceptions to the general rule that a warrant must be secured before a search is undertaken. . . ." *California v. Carney*, 471 U.S. 386, 390 (1985). One exception relevant here, provides that "the warrant and probable cause requirements generally do not apply to searches of parolees, probationers[,] or their residences." *United States v. Smith*, 526 F.3d 306, 308 (6th Cir. 2008) (citing *Samson*, 547 U.S. at 857; *United States v. Knights*, 534 U.S. 112, 118 (2001)). As the district court noted, a particular Fourth Amendment reasonableness analysis applies to parolee searches—a totality of the circumstances test that requires "assessing, on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests[]"—rather than an examination of "individualized suspicion." *Samson*, 547 U.S. at 848, 855 n.4 (internal quotation marks and citation omitted). The Court in *Samson* thus "conclude[d] that the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Id.* at 857.

---

signed by the defendant. As this court has previously noted, there are "two distinct analytical approaches under which a warrantless probationer [or parolee] search may be excused." *United States v. Herndon*, 501 F.3d 683, 688 (6th Cir. 2007) (citation omitted). The first, characterized as "special need" cases, addresses statutes and regulations permitting searches under the two-prong approach advocated by Massengill. *See, e.g.*, *Griffin v. Wisconsin*, 483 U.S. 868 (1987). The second applies a totality of the circumstances analysis to instances involving defendants subject to a search condition. *See, e.g.*, *Samson v. California*, 547 U.S. 843 (2006). Massengill's argument in favor of *Doxey* confuses the two approaches, advocating for the first where, here, the second is applicable.

*Samson* governs here, as Massengill signed a clear and unambiguous warrantless search condition on the parole certificate, diminishing his reasonable expectation of privacy. Given Tennessee's interest in adequately supervising Massengill's parole status, the parolee search of his residence was reasonable, and the district court's denial of Massengill's suppression motion is affirmed.

B.

Massengill next attacks the sufficiency of the evidence on the charge of conspiracy to possess methamphetamine with intent to distribute. [Appellant Br. 8, 19-22.] "To sustain a conviction for drug conspiracy . . . the government must prove beyond a reasonable doubt: (1) an agreement to violate drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007) (citation omitted).

Massengill argues that "the government relied exclusively on [his] unrecorded statements" regarding his methamphetamine purchases from his source in Atlanta "as its evidence to support the conspiracy count."[3] [Appellant Br. 20.] However, as the government noted, "evidence of repeat purchases provides evidence of more than a mere buyer-seller relationship." *United States v. Brown*, 332 F.3d 363, 373 (6th Cir. 2003) (citation omitted). Further, the evidence at trial also implicated at least two additional coconspirators: Hughes and Massengill's customers. Viewing the evidence in the light most favorable to the prosecution and making all reasonable inferences and credibility choices in support of the jury's guilty verdict, a rational trier of fact could have found that Massengill agreed to violate drug laws, knowingly and intentionally joined the

---

[3] Despite being represented by counsel, Massengill entered a pro se affidavit disputing, inter alia, that he had admitted making three trips to Atlanta to purchase kilogram quantities of methamphetamine. [Appellant Aff. 1.]

conspiracy, and participated in the conspiracy, with one or more of the implicated coconspirators, beyond a reasonable doubt. Massengill's own admission regarding buying methamphetamine from Chuck in Atlanta is itself persuasive evidence. Likewise, Massengill's jailhouse calls with Hughes can reasonably be construed to refer to drug sales, connecting both Hughes and potential customers to the conspiracy. Overall, Massengill has failed to demonstrate that his conspiracy conviction is not supported by substantial and competent evidence.

C.

Third, Massengill argues that the district court abused its discretion by denying his motion for a mistrial based on Ownby's disclosure of Massengill's parole status and statements regarding the use of methamphetamine in his residence. [Appellant Br. 22-26.] The United States counters that the contested testimony constituted only a small fraction of the evidence against Massengill and a limiting instruction that the jury disregard the testimony was given, rendering the denial proper. [Appellee Br. 27-28.]

We review a district court's denial of a motion for mistrial under the abuse-of-discretion standard. *United States v. Ward*, 190 F.3d 483, 491 (6th Cir. 1999) (citations omitted). In determining whether improper statements warrant granting a mistrial, we consider:

> (1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether a limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant.

*Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003) (citing *United States v. Forrest*, 17 F.3d 916, 920 (6th Cir. 1994)). Our "primary concern is fairness to the defendant." *Forrest*, 17 F.3d at 919.

As noted above, the contested testimony was nonresponsive to the government's questioning on direct, and was taken from a reasonable line of questioning—regarding the officer's involvement in the execution of the search and what the target of the search was. Following the

second nonresponsive answer, a sidebar was called in which the defense objected, and the district court gave a curative instruction immediately thereafter. Massengill's claim that "[t]he prosecution's first witness engaged in a calculated effort" to introduce this testimony is mere conjecture. [Appellant Br. 24-26.] The same can be said of his allegation that the limiting instruction "only made matters worse by drawing the jurors' attention to the prejudicial testimony." [*Id.* at 26.] Moreover, the evidence offered by the prosecution—including evidence of more than a kilogram each of methamphetamine and marijuana, paraphernalia related to the sale of controlled substances, a loaded firearm, and Massengill's own admissions regarding trips to buy drugs from a source in Atlanta—was extensive. Ownby's statements were a small part of the evidence against the defendant. Thus, four of the *Forrest* factors weigh in favor of the government, and Massengill's unsubstantiated allusion to bad faith is not enough to support his claim on appeal. The district court's denial of the defense motion for mistrial is therefore affirmed.

D.

Massengill next contends that the government's direct examinations of Ownby and Hicks regarding Massengill's failure to file a civil forfeiture claim to the money seized in the search violated Massengill's Fifth Amendment privilege against self-incrimination. [Appellant Br. 26-29.]

During its direct examination of Ownby, the prosecution asked whether there was any "opportunity for the defendant to challenge the seizure of [the] money [seized in the search]." [R. 171, PageID 2088.] Ownby replied that Massengill "could have filed his forfeiture notice within 30 days of the money being seized[,]" but that he had not done so. [*Id.*] Similarly, during the direct examination of Hicks, the government began a line of questioning as to the lack of a claim following the money's seizure. [R. 172, PageID 2223-25.] Neither time did the defense

object; rather, the district court sua sponte raised the issue during a recess, noting that there had "been some testimony . . . elicited by both sides without objection," including regarding "Massengill's choice not to oppose the seizure or the forfeiture." [*Id.* at 2291.] The court noted that while no objection had been raised, and although it "ha[d] not researched this," it thought "there's at least an argument that that could be a Fifth Amendment issue." [*Id.*] After tabling the issue, the defense put on evidence during its case-in-chief regarding the source of the money. [*Id.* at 2291-93, 2381-83.] The court noted that such testimony "t[ook] some sting out of it[,]" but nonetheless elected to give an instruction that the jury not consider the testimony by regarding the potential forfeiture claim as evidence of Massengill's guilt. [R. 176, PageID 2477-78, 2480-82; R. 177, PageID 2497-98.]

"[W]hen a party fails to object to evidence at the trial court, his contention on appeal will prevail only if the trial court's evidentiary decision was plainly erroneous, thus affecting his substantial rights and resulting in a miscarriage of justice." *United States v. Evans*, 883 F.2d 496, 499 (6th Cir. 1989) (citing Fed. R. Crim. P. 52(b)) (citations omitted).

Juries are presumed to have followed the trial court's instructions. *United States v. Carter*, 520 F. App'x 377, 385 (6th Cir. 2013) (citing *Zafiro v. United States*, 506 U.S. 534, 540 (1993)). Massengill has offered no reason to abandon this presumption and therefore cannot demonstrate that the testimony actually affected his substantial rights. His argument on appeal is thus rejected, and the district court's corrective actions affirmed.

E.

Finally, Massengill appeals the district court's application of an obstruction-of-justice sentencing enhancement because it resulted in a procedurally unreasonable sentence. Massengill claims that the factual basis contained in the PSR "is not an accurate rendition of [the] recorded

telephone conversations[]" and the government therefore failed to meet its burden of proving the applicability of an obstruction-of-justice enhancement by a preponderance of the evidence. [Appellant Br. 29-33.]

Sentences are reviewed by this court "under a deferential abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 41 (2007). The imposition of the obstruction-of-justice enhancement, specifically, is reviewed in three parts:

> First, we review the factual determinations made by the district court for clear error. Second, the determination that certain conduct constitutes obstruction of justice, which is a mixed question of law and fact, is reviewed *de novo*. Third, because the application of the obstruction enhancement is non-discretionary, the actual imposition of the enhancement is reviewed *de novo*.

*United States v. Baggett*, 342 F.3d 536, 540-41 (6th Cir. 2003) (internal citations omitted). We also "give due deference to the district court's application of the guideline to the facts." *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009) (citing *Buford v. United States*, 532 U.S. 59, 66 (2001); *United States v. Cline*, 362 F.3d 343, 350 (6th Cir. 2004)).

A two-level enhancement for obstruction of justice is appropriate where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction. . . ." USSG § 3C1.1. Application Note 4 of § 3C1.1 includes in its "non-exhaustive list of examples of the types of conduct to which this adjustment applies" instances in which the defendant "destroy[ed] or conceal[ed] or direct[ed] or procur[ed] another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding . . . or attempting to do so. . . ." USSG § 3C1.1 cmt.4. The government has the burden of proving the applicability of the enhancement by a preponderance of the evidence. *United States v. Dunham*, 295 F.3d 605, 609 (6th Cir. 2002) (citations omitted).

The PSR included the obstruction-of-justice enhancement due to Massengill's telling "Shannon Hughes to get the remainder of his drugs out of the hole in the back yard of his residence." [R. 155, PageID 1810.] Massengill objected to that finding, both in writing and at the sentencing hearing. [R. 150, PageID 1785; R. 157, PageID 1828; R. 180, PageID 2561.] At sentencing, the district court overruled Massengill's objection and accepted the guidelines calculations in the PSR, specifically referencing the jailhouse calls offered into evidence by the prosecution as "very clearly support[ing] this enhancement." [R. 180, PageID 2554-65.]

Massengill's argument includes conjecture that the calls were not about retrieving controlled substances at all, and concludes that "[s]ince the competing inferences to be drawn from the jail calls are evenly balanced, the government fell short of proving obstruction of justice under the preponderance standard." [Appellant Br. 32.] However, Massengill offered no competing evidence regarding the context of the calls, and the context he references as leading to "competing inferences" on the calls—Massengill's expressions of concern about people "obtaining unauthorized entrance into his residence and control over his belongings[]" [Appellant Br. 31-32]—was included in the record considered by the district court. The district court's factual determination that the jailhouse calls proved, by a preponderance of the evidence, the propriety of the enhancement is not, therefore, clearly erroneous. It further appears that, given the factual finding that the jailhouse call reflected Massengill directing Hughes to remove controlled substances from his residence, such actions fall within the examples provided in the enhancement's commentary, such that the conduct constitutes obstruction of justice. USSG § 3C1.1 cmt.4. Finally, under the third consideration made by this court on review, the imposition of the enhancement was sound.

AFFIRMED.

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part.

I concur in Parts II-A, II-C, II-D, and II-E of the majority opinion. I dissent, however, from Part II-B, because I do not agree that the government presented sufficient evidence for a reasonable juror to find Massengill guilty of conspiracy to possess with the intent to distribute methamphetamine. I would therefore reverse the district court's order denying Massengill's motion for judgment of acquittal, vacate his sentence, and remand for re-sentencing on the remaining counts.

"To establish a drug conspiracy, the government must prove an agreement to violate the drug laws—*i.e.*, to manufacture or distribute drugs—and that each conspirator knew of, intended to join, and participated in the conspiracy." *United States v. Beals*, 698 F.3d 248, 258–59 (6th Cir. 2012) (citation omitted). The government has the burden to prove that "each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *Id*. at 259 (quoting *United States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982)).

The government argues, and the majority agrees, that the evidence at trial showed a conspiracy between Massengill and "Chuck," the source of his methamphetamine. Following his arrest, Massengill was questioned by Officer Maskew of the Bradley County Sheriff's Department. Officer Maskew testified:

> Q: Did you ask the defendant about his source of methamphetamine?
> A: I did.
> Q: What did the defendant say about his source?
> A: He stated that his source was a white male named Chuck in Atlanta.
> . . .
> Q: Did you ask how the defendant retrieved methamphetamine from his source in Atlanta?
> A: Yes.
> Q: And what did he say?
> A: He would drive to Atlanta and meet with Chuck and he did so on at least three occasions, each time getting a pound of ice methamphetamine.
> Q: Did he say how frequently? Did you say—did you repeat how frequently the defendant—

A: I asked him—
Q: Okay.
A: —how many times, and he said at least three.
Q: And at what frequency? How regularly did he go to make those three trips?
A: It was within the—the two or three months preceding this incident.
Q: Did you ask the defendant about how much he had paid for the methamphetamine that was found in his closet?
A: I did.
Q: What was the defendant's answer?
A: $20,000.

(R. 172, PID 2278–80.) Officer Collins testified to the same.

This was the entirety of the government's evidence of a conspiracy between Massengill and Chuck to possess with the intent to distribute methamphetamine. The government provided no other information about Chuck. The record does not reveal the scope or nature of his drug operation or suggest that he had any agreement or understanding with Massengill regarding the distribution of the drugs. The jury heard only that Massengill purchased a pound of methamphetamine from Chuck on three separate occasions, over the course of two or three months. Although we have found that in chain conspiracies, "the interdependence of the enterprise" gives rise to an inference of conspiracy, *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999), there is no evidence that Chuck depended on Massengill for business (or vice versa), making such an inference wholly speculative. Nothing in the record suggests that the Massengill and Chuck pooled resources, supplies, or equipment in support of a shared goal. *See United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002). Nor does it appear that Chuck fronted drugs to Massengill on credit. *See United States v. Henley*, 360 F.3d 509, 514 (6th Cir. 2004). In other words, there is simply no evidence—either direct or circumstantial—to support the conclusion that Massengill and Chuck "agreed to participate in what [they] knew to be a collective venture directed toward a common goal." *Beals*, 698 F.3d at 259.

- 15 -

The majority relies on the fact that Massengill purchased large quantities of drugs from Chuck, but this alone is insufficient to support the inference that a conspiracy existed between them. Although we have said in prior cases that "[e]vidence of repeat purchases provides evidence of more than a mere buyer-seller relationship," and that evidence of a "large volume of narcotics creates an inference of conspiracy," *United States v. Brown*, 332 F.3d 363, 373 (6th Cir. 2003) (citations omitted), none of our cases has upheld a conspiracy conviction on facts similar to those here. In *Brown*, multiple witnesses testified that they bought cocaine from the defendant, that the defendant helped them process the cocaine into crack, and that the defendant gave drugs to other conspirators on consignment. *Id.* In *United States v. Anderson*, in addition to evidence of multiple large purchases, a law-enforcement agent testified that the defendant named the head of the conspiracy as his supplier, and that police found a pager in the defendant's apartment connecting him to the conspiracy. 89 F.3d 1306, 1311 (6th Cir. 1996). And in both *Brown* and *Anderson*, the defendant merely disputed his connection to a conspiracy that was clearly established by other evidence. *Brown*, 332 F.3d at 372–73 (conspiracy involving at least seven people); *Anderson*, 89 F.3d at 1308–09 (twenty-nine-member "Best Friends" narcotics organization). Here, there was no evidence that Chuck was involved in a drug conspiracy.

The case law simply does not support the proposition that evidence of three drug sales involving large quantities, with nothing more, is sufficient to show that the buyer and the seller agreed to form a conspiracy to possess with the intent to distribute the drugs. To hold otherwise would convert every large repeat drug sale into a de facto distribution conspiracy. *See United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010) ("[W]e have cautioned against conflating the underlying buy-sell agreement with the drug-distribution agreement that is alleged to form the basis of the charged conspiracy. To support a conspiracy conviction, there must be sufficient

evidence of an agreement to commit a crime *other than* the crime that consists of the sale itself." (citation and internal quotation marks omitted)).

Nor is the evidence sufficient to establish that Massengill agreed to form a drug conspiracy with Shannon Hughes. Two recorded jailhouse phone calls between Massengill and Hughes were played at trial. During the first call, Massengill described a stash of marijuana that the police had not yet found. In the second call, the two discussed a hiding hole in Massengill's back yard. Massengill asked Hughes to remove the contents of the hole, and Hughes responded, "It'll be taken care of." (Ex. 40-K1, 5:30–6:20, 12:09–13:02.) Masengill then stated, "That way it'll help get some money on my books, too." (*Id.*)

The jailhouse calls show that Hughes knew that Massengill possessed a large quantity of marijuana, and her statement that the hidden evidence would be "taken care of" evinces agreement to move unspecified evidence out of the reach of law enforcement. However, the calls do not support a conclusion, beyond a reasonable doubt, that Hughes agreed to participate in what she knew was a conspiracy to distribute methamphetamine. No evidence was introduced showing that Hughes agreed to purchase meth, possess meth, or sell meth. Law-enforcement officers later found the hiding hole empty, and were unable to verify what was previously inside. And even assuming that the hiding hole contained drugs, the jailhouse calls only make reference to an undiscovered cache of marijuana, not methamphetamine. Although the calls show a concert of action between Massengill and Hughes, coordinated action alone is insufficient to prove a conspiracy to distribute illegal drugs. *See United States v. Sliwo*, 620 F.3d 630, 633–37 (6th Cir. 2010) (renting van for co-conspirators and serving as look-out not sufficient to show agreement to join distribution conspiracy).

Finally, the text messages between Massengill and his customers do not establish a conspiracy. The messages do not indicate agreement or intent to join a conspiracy, or suggest involvement in Massengill's drug activity other than the mere purchase of drugs. Agent Mark Delaney explained that the terminology in the texts were slang terms used in the drug trade to describe amounts of drugs that could be sold for personal use—"teenagers," for example, refers to a sixteenth of an ounce of methamphetamine, less than two grams, which is hardly a distribution-level quantity. Thus, the text messages do not suggest that Massengill and his customers had more than a mere buyer-seller relationship.

For these reasons, I conclude there was insufficient evidence from which a reasonable juror could find Massengill guilty of conspiracy to possess with the intent to distribute methamphetamine, and respectfully dissent as to Part II-B.